## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 05-371 (CKK) |
| | : | |
| v. | : | |
| | : | |
| KESETBRHAN M. KELETA, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

### Introduction

In its October 25, 2006, minute order, the Court directed the parties to address the objection that the defendant raised to the Probation Office's application of the cross-reference in § 2S1.3 to the table in § 2B1.1. In particular, § 2S1.3(a)(2) provides that, for defendants convicted of violating 18 U.S.C. § 1960, along with certain other offenses to which the guideline applies, the Court is to increase the base offense level by the number of levels indicated in the table in § 2B1.1(b)(1) corresponding to the value of funds involved in the illegal activity. Keleta claims that, because § 2B1.1 is the guideline for fraud and theft offenses and the table in § 2B1.1(b)(1) has a column captioned "loss," the Court cannot apply the table unless the defendant's conduct in unlawfully transmitting funds overseas caused a discernible loss to some victim.

Keleta's interpretation of the interplay between § 2S1.3(a)(2) and the table in § 2B1.1 is completely wrong. There is absolutely no authority for reading a "loss" requirement into the guideline section governing violations of 18 U.S.C. § 1960, a provision in the United States criminal code that does not seek to punish deception or stealing, but instead targets other evils

such as money laundering and the unregulated transfers of funds overseas.  The government is

unaware of any court that has interpreted § 2S1.3(a)(2) in the manner that Keleta suggests here.

On the other hand, the First Circuit has rejected the very claim that Keleta makes that there must

be loss to a victim or victims in an offense governed by § 2S1.3 before the cross reference to the

table in § 2B1.1 can apply.  To accept Keleta's reading of § 2S1.3 would be contrary to the

express terms of that guideline provision, contrary to the mandates of § 1B1.5(b)(2) (which

instructs on how to apply references to tables in other guideline sections), and contrary to

Congress' goals in making the operation of unlicensed money transmitting business illegal and

subject to criminal sanctions.

The Court's October 25, 2006 minute order also directed the parties to address "based on

the evidence, the exact amount that Mr. Keleta personally authorized as opposed to any amount

authorized by others from the Himbol account between May 2001 and September 2002."  At

trial, the government only introduced evidence concerning transfers overseas that Keleta

personally sent or authorized.  It provided that same evidence to the Probation Office to support

the calculations in the Presentence Report ("PSR").  Government Exhibit 13, which is attached

as Exhibit 1 to this memorandum, summarized the 33 wire transfers from the Himbol Riggs bank

account to accounts overseas or in the United States between May 2001 and September 2002 that

Keleta himself signed and authorized.  These totaled $8.3 million.  There was not single transfer

included in the summary that anybody else authorized.  Likewise, Government Exhibit 14, which

is attached as Exhibit 2 to this memorandum, summarized the 261 daily transfers overseas that

Keleta personally signed and approved between May 2001 and July 2002.  These totaled $2.9

million.  Once again, the government did not include any transfers that anyone else associated

with Himbol authorized during this time period.

The PSR's calculation of the value of funds that Keleta transferred is thus accurate and fair. The resulting offense level of 26 and its recommended sentencing range of 63 to 78 months are reasonable. A sentence within that range would properly account for all of the sentencing factors set forth in 18 U.S.C. § 3553(a). On the other hand, it is clear that Keleta will be seeking a sentence of probation or a sentence with a very short period of incarceration. Such a sentence would not comport with the sentencing goals articulated in § 3553(a). Among other things, it would not reflect the seriousness of Keleta's crimes, would not promote respect for the law, and would have little deterrent effect on others tempted to run an unlicensed money transmitting business. In addition, an overly lenient sentence here would lead to an unwarranted disparity with the sentences that defendants convicted of similar conduct have received, especially in this district. In particular, it would conflict with the 40-month sentence that Judge Urbina recently imposed on the defendant in United States v. Aissatou Pita Barry, Cr. No. 05-210 (RMU). The only real difference between Keleta and Ms. Barry, who was convicted of operating an unlicensed money transmitting business in the District of Columbia that sent funds to Ghana, is that Ms. Barry accepted responsibility and pled guilty to violating 18 U.S.C. § 1960. The Court should impose a significant sentence on Keleta.

## Argument

I.    **The Application of the Cross-Reference in Section 2S1.3 to the Table in Section 2B1.1, whose Purpose Is to Use the Volume of Funds Transferred as a Measure of the Seriousness of the Offense, Does Not Depend on whether the Defendant Caused a Loss**

At the outset, the government notes that there is no decision, whether published or

unpublished, that supports Keleta's interpretation of the operation of the cross-reference in § 2S1.3 to the table in § 2B1.1. Moreover, as set forth in Part III below, the government has done an extensive search for examples of other sentences in § 1960 prosecutions that courts have imposed. The government is unaware of a single judge who has declined to use the cross-reference to the § 2B1.1 table because the government failed to prove that a defendant's conduct in illegally transmitting funds caused a loss.

The First Circuit has rejected Keleta's claim that there must be a loss before the cross-reference to the § 2B1.1 table applies. In <u>United States v. Beras</u>, 183 F.3d 22 (1ˢᵗ Cir. 1999), the defendant was convicted of failing to report that he was transporting more than $10,000 out of the United States in violation of 5 U.S.C. §§ 5316(a)(1)(A) and 5322. 183 F.3d at 24. This crime is one of the offenses for which § 2S1.3 is the applicable guideline. In addressing the same issue that Keleta raises here, the First Circuit stated:

> First, Beras claims that the district cour erred in applying a seven-point enhancement pursuant to U.S.S.G. § 2F1.1(b)(1)(h)[1], which states that such an enhancement is appropriate for a "loss" that exceeds $120,000. According to Beras, because there was no "loss" in his crime, the seven-point enhancement is inappropriate. Beras's argument is without merit. The district court properly referred to U.S.S.G. § 2S1.3, which provides the base offense level for the "Failure to File Currency and Monetary Instrument Report." The base offense level is "6 plus the number of offense levels from the table in § 2F1.1 . . . corresponding to the value of the funds." The district court thus properly enhanced Beras's sentence by seven points because the "value of the funds" exceeded $120,000.

<u>Id</u>. at 27.

Keleta's reading of the cross-reference in § 2S1.3 is thus contrary to the plain language of that guideline section. The text makes it clear that the table in § 2B1.1 is to provide a measure of the seriousness of the offense in relation to "the value of the funds." <u>See</u> § 2S1.3(a)(2). If

---

[1] When Beras was sentenced, the § 2B1.1 table was set forth in § 2F1.1.

operation of this provision of the guideline were to hinge on whether a defendant caused a loss, the Sentencing Commission would have said so explicitly.

Keleta's interpretation of the cross-reference is also inconsistent with the mandates of § 1B1.5 (Interpretation of References to Other Offense Guidelines). It provides:

> An instruction to use a particular subsection <u>or table</u> from another offense guideline refers only to the particular subsection <u>or table referenced, and not to the entire offense guideline</u>.

§ 1B1.5(b)(2) (emphasis added). Section 2B1.1(b)(1) appears in the guideline for offenses denominated as "Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States." In the context of that guideline, it is logical that the table in § 2B1.1 has a column called "loss." However, it would be inappropriate and contrary to § 1B1.5(b)(2) to import a requirement of loss into the application of the cross-reference in § 2S3.1, especially where, as here, fraud or any other means of causing a loss is not an element of the offense of conviction.

Cross-references to § 2B1.1 appear throughout the Guidelines. <u>See</u>, <u>e.g.</u>, §§ 2B3.3 (blackmail), 2B4.1 (commercial bribery), 2B5.3 (copyright and trademark infringement), 2B6.1 (altering or removing vehicle identification numbers and trafficking in stolen motor vehicle parts), 2C1.1 (offering or soliciting bribes and extortion under color of right), 2C1.8 (Federal Election Campaign Act violations), and 2S1.1 (money laundering). The underlying offenses for many of these guideline sections do not involve any type of loss. That fact does not preclude application of the table. The purpose of the cross-reference in such sections is merely to use the amount of money involved as a means of reflecting the seriousness of the defendant's criminal

conduct.  See, e.g., United States v. Puckett, 61 F.3d 1092, 1097 (4th Cir. 1995) (noting that background commentary to § 2S1.1 states that "[t]he amount of money involved is included as a factor because it is an indicator of the magnitude of the criminal enterprise and the extent to which the defendant aided the enterprise.").

The structure of § 2S3.1 further negates Keleta's contention that loss is a prerequisite to use of the § 2B1.1 table.  Section 2S1.3 contains a "safe harbor" provision that enables a defendant to avoid receiving the otherwise applicable enhancements from the § 2B1.1 table.[2]  See

---

[2]  Keleta did not seek relief under the "safe harbor" provision of § 2S1.3(b)(3), and the Probation Office does not recommend that he receive such relief.  As Judge Urbina held in Barry, it is the defendant who has burden of proof in establishing his entitlement to an offense level reduction pursuant to this subsection.  See Memorandum Order dated December 15, 2005, attached as Exhibit 3.  See also United States v. Abdi, 342 F.3d 313, 317 (4th Cir. 2003), cert. denied , 540 U.S. 1167 (2004), ("[T]he defendant, not the government, has this burden of showing entitlement to any *reduction* [under the § 2S1.3 'safe harbor'].").  Even if he wanted to, Keleta could not satisfy the criteria set forth in § 2S1.3(b)(3).

The government concedes that this matter satisfies the first prong of the "safe harbor" test – that is, subsection (a)(2) applies and subsections (b)(1) and (b)(2) do not apply.  However, Keleta also would have to demonstrate that he "did not act with reckless disregard of the source of the funds." § 2S1.3(b)(3)(B).  Keleta could never meet this burden.  Himbol had no controls in place to verify that the funds being transferred were clean.  Indeed, the testimony at trial was that much of the money the business received simply came in the mail.  All the sender needed to demonstrate was that the recipient overseas had a phone number or a bank account.  No one at Himbol ever inquired as to the source of the funds that the business was handling.  Nor did the staff receive any training on how to detect suspicious transactions.  Significantly, the Department of the Treasury regulations that govern the operations of a money transmitting business such as Himbol require the operation to have certain controls in place.  In particular, under 31 C.F.R. § 103.125, money transmitters are required to develop and implement an Anti-Money Laundering ("AML") compliance program.  Each AML compliance program must be in writing and must:

i.      incorporate policies, procedures and internal controls reasonably designed to assure compliance with the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5312 *et seq.;*

ii.     designate a compliance officer responsible for day-to-day compliance with the BSA and the compliance program;

§ 2S1.3(b)(3).  For a defendant to gain the benefit of a sentencing reduction under § 2S1.3(b)(3),

he must satisfy four conditions.  First, subsection (a)(2) must apply to the case, and the

enhancements in subsections (b)(1) and (b)(2) must not apply.  In addition, a defendant must

show that he "(B) . . . did not act with reckless disregard of the source of the funds; (c) the funds

were the proceeds of lawful activity; and (D) the funds were to be used for a lawful purpose

. . . ."  See § 2S1.3(b)(3).  If these criteria are met, then a court is to "decrease the offense level

to **6**."  The "safe harbor" provision would be superfluous if all defendant had to do to avoid any

enhancements from the § 2B1.1 table would be to argue that the government failed to prove a

loss.  Moreover, if the Sentencing Commission had wanted an absence of loss to be an additional

basis for not enhancing the base offense level under § 2S1.3, it would have said so explicitly.

Finally, to hold that there must be a loss before a court can apply the cross-reference to

§ 2B1.1 would be inconsistent with Congress' intent in enacting § 1960 and in making violations

---

iii.    provide education and/or training of appropriate personnel; and

iv.    provide for independent review to monitor and maintain an adequate program.

Keleta and Himbol instituted none of the protections that the regulations require.

Keleta further would have to establish that the "the funds were the proceeds of lawful activity." § 2S1.3(b)(3)(C).  Keleta would fail to satisfy this requirement because, as discussed in the previous paragraph, he had no controls in place to ensure that the money Himbol was transmitting was the proceeds of legal activities.

Last, a defendant must be able to show that "the funds were to be used for a lawful purpose." § 2S1.3(b)(3)(D).  Again, because of the absence of controls, Keleta and Himbol had no idea for what purpose the recipients of the funds would use the money.  In any event, the government has evidence that some of the wire transfers were separate unlawful acts, wholly apart from being violations of 18 U.S.C. § 1960.  As set forth in Government Exhibit 14, approximately $12,020 in wire transfers went to Libya during 2001 and 2002.  These wire transfers violated the U.S. government's ban on financial transactions with Libya that was in effect at that time.  See 31 C.F.R. § 550.202.

of the statute punishable by incarceration.  In the legislative history of the Act, there is the

following statement:

> Sections 407 and 408 of the Conference Report address the issue of money laundering at
> money transmitters. . .  The Conferees believe that such businesses are particularly
> vulnerable to money laundering schemes because their level of [Bank Secrecy Act]
> compliance is generally lower.

H.R. Conf. Rep. No. 103-652, at 191 (1994).  When the scienter requirement was removed from

§ 1960 as part of the Patriot Act, the House Report observed:

> [A] major share of terrorist financing is conducted through international cash couriers as
> well as through informal banking systems, like the ancient South Asian money exchange
> system called hawala . . .  These underground systems are exploited by terrorists and
> other financial criminals because of the lack of record-keeping and opportunity for
> anonymity.

H.R. Rep. No. 107-25, a 33 (2001).  It is therefore clear that the purpose behind § 1960 is not to

deter fraud or theft, but rather to combat money laundering and to target those who create

vulnerabilities in the system through the unregulated flow of funds.  It would subvert those goals,

and undermine efforts at deterrence, if the government had to prove a loss before it could take

advantage of the cross-reference in § 2S1.3 to the § 2B1.1 table.  Loss is simply not an issue in

§ 1960 prosecutions.  It would be bizarre indeed if the issue of loss suddenly became the focus at

the sentencing of a defendant who violated that law.

**II.     The $8.3 Million in Wire Transfers and $2.9 Million in Daily Transfers Represent
the Sums of Transactions that Keleta, as Opposed to Anyone Else at Himbol,
Personally Authorized between May 2001 and September 2002**

At trial, the government introduced two summary exhibits – Government Exhibit 13 and

Government Exhibit 14 – to show the extensive amount of financial transactions that Keleta

personally directed and approved during the time that he was at Himbol.[3]  The purpose of these

exhibits was to aid in proving one of the elements of the § 1960 charges – that is, that Keleta

conducted, controlled, managed, supervised, or directed a money transmitting business.

Special Agent Katarina Gikas of Immigration and Customs Enforcement ("ICE")

prepared the summary exhibits.  She testified that, with respect to Government Exhibit 13, she

examined records that the government had obtained from Riggs Bank for the account that

Himbol used.  In particular, Agent Gikas focused on the records showing wire transfers out of

that account.  When reviewing the wire transfer forms, she selected for inclusion in the summary

exhibit only those documents that appeared to bear Keleta's distinctive signature.  This process

resulted in the selection of 33 wire transfers forms with Keleta's signature for the period of May

2001 through September 2002.[4]

With respect to Government Exhibit 14, Agent Gikas did a similar examination of the

daily money order forms that ICE agents seized when conducting a search of Himbol on April

13, 2003.  As Tsigerada Gebru testified, these forms showed for each day where Himbol was to

send funds on behalf of its customers.  Agent Gikas again culled out only those forms that had

Keleta's signature on the "authorized by" line.  This resulted in her removal of 261 daily money

---

[3]  Keleta did not object to the admission of either Government Exhibit 13 or Government
Exhibit 14.

[4]  In order to underscore the fact that the documents underlying the summary only related
to wire transfers that Keleta himself prepared and authorized, Agent Gikas titled the summary
chart "Keleta, Riggs Bank Wire Transfers by Destination Country, May 2001 - September 2002
($8,251,544 USD Total)."

order forms covering the period from May 2001 through July 2002.[5]

Agent Gikas put the 33 records underlying Government Exhibit 13 in a notebook labeled Government Exhibit 13A. She likewise put the documents underlying Government 14 in a notebook labeled Government Exhibit 14A.[6]

In order to authenticate the records and to verify that Agent Gikas was correct in her selection of records that Keleta appeared to have signed, the government called two witnesses who were familiar with Keleta's signature. Tiyanjana Mbaya testified for the government that she used to work in the embassy banking division of the former Riggs Bank. She was familiar with the accounts of the Embassy of Eritrea, including the account that Himbol used. Ms. Mbaya also knew Keleta from his many visits to the bank on behalf of Himbol, and she identified him in court. She further testified that, through her work at Riggs, she had become familiar with Keleta's signature. At the government's request, Ms. Mbaya reviewed all of the wire transfer forms in Government Exhibit 13A. She explained what the forms meant. In addition, Ms. Mbaya testified that signature on the "sender" on each of the 33 forms in Government Exhibit 13A appeared to be that of Keleta.[7]

Fessahaie Tekle testified about a number of subjects for the government. He, too, was

---

[5] Again to emphasize that Government Exhibit 14 was a summary of daily order forms that only Keleta approved, Agent Gikas titled that summary chart, "Keleta, Authorized Wire Transfers, May 2001-July 2002 ($2,858,845 USD)."

[6] The government will have both Government Exhibit 13A and Government Exhibit 14A available at the sentencing in case the Court wants to review them.

[7] Ms. Mbaya also examined the monthly statements for the Himbol account for the months covered by Government Exhibit 13, and she verified that the bank had in fact sent each of the wire transfers for which Keleta had signed.

familiar with Keleta's signature.  Like Ms. Mbaya, Mr. Tekle reviewed the records in

Government Exhibit 13A and stated that each had been signed by Keleta.  Mr. Tekle also

examined each of the 261 records that underlay Government Exhibit 14 and comprised

Government Exhibit 14A.  He testified that Keleta's signature appeared on every one of these on

the "authorized by" line.  Mr. Tekle further testified that, when he first reviewed Government

Exhibit 14A at the government's request, he found some money order forms that Keleta had not

signed.  According to both Mr. Tekle and Agent Gikas, the government removed those forms

from the exhibit and from the summary.

In short, the figures that government provided the Probation Office for purposes of

calculating Keleta's guidelines score rest, as the government's trial evidence showed, on

unlawful transfers that Keleta, and Keleta alone, authorized.

## III.    Keleta's Conduct Warrants a Significant Sentence

### A.    Legal Standards

In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court ruled that the

Guidelines are no longer mandatory.  However, in the remedy portion of the opinion, the Court

also made it clear that, in determining the appropriate sentence for a defendant, the district court

judge must calculate and consider the applicable guidelines range, refer to the pertinent

Sentencing Commission policy statements, and bear in mind the need to avoid unwarranted

sentencing disparities.  Although the judge must also weigh the factors enunciated in 18 U.S.C.

§ 3553(a), "it is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than

render the Guidelines a body of casual advice to be consulted or overlooked at the whim of a

sentencing judge."  United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005).  As one member

of this Court has held, "Booker requires judges to engage in a two-step analysis to determine a reasonable sentence." United States v. Doe, 412 F. Supp.2d 87, 90 (D. D.C. 2006) (Bates, J.)

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing sentence.

United States v. Hughes, 401 F.3d 540, 546 (4th Cir. 2005).

In United States v. Dorcely, 454 F.3d 366 (D.C. Cir. 2006), the D.C. Circuit held that "a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness." 454 F.3d at 376. The Court of Appeals also held that, in resolving issues under the Guidelines, the district court uses a preponderance of the evidence standard and that consideration of acquitted or uncharged conduct is appropriate. Id. at 372.

When weighing the § 3553(a) factors as part of its calculus of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives – that is, that the sentence (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively provide the defendant with needed educational or vocational training and medical care. See 18 U.S.C. § 3553(a)(1) and (2). In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

**B.     An Analysis of the Factors Enunciated in 18 U.S.C. § 3553(a) Demonstrates that a Sentence within the Calculated Guidelines Sentencing Range Is Appropriate**

**1.     The Nature and Circumstances of the Offense**

Although Keleta is likely to characterize his crime as a mere failure to comply with regulatory requirements, his conduct is more serious than that. As Congress has observed in the portions of the legislative history of § 1960 quoted above, the unregulated flow of money provides an avenue for those who have committed, or are planning to commit, serious offenses to hide and launder their funds. The government does not have evidence that any terrorist organizations ever used the Himbol branch in Washington to transfer cash overseas. Nevertheless, Himbol serviced several countries in East Africa and the Middle East where groups inimical to the United States operate. In addition, Himbol's records reveal that, while Keleta was running the business, a handful of individuals used Himbol in the District of Columbia to evade the former U.S. sanctions against Libya.

There is one particularly aggravating factor in this case. Keleta acted willfully. From the day he began managing the Himbol operation in Washington, he knew that the business needed a license to operate lawfully, and he knew that it lacked one. Moreover, in the license that application he submitted to the D.C. Department of Banking and Finance, Keleta intentionally failed to disclose, as requested, that Himbol had been operating as an unlicensed money transmitting business or that he had been managing such an operation. There are individuals who, since October 2001, can violate § 1960 without knowing that their conduct was unlawful. Such persons might be entitled to some additional leniency. Keleta, however, was not such a person, and he should not qualify for a lenient sentence.

-13-

###         2.        The History and Characteristics of the Offender

The government acknowledges that Keleta has raised himself from humble circumstances and demonstrated his intelligence and talents.  The Court is entitled to give that factor some weight, especially in determining where in the guideline range to sentence Keleta.  Keleta also has a young family, although so do many of the individuals whom the Court must sentence. While the government has sympathy for the family and recognizes the hardships they will soon face, those hardships, sadly, are not unusual in these situations.

###         3.        The Need to Promote Respect for the Law, to Provide Just Punishment, to Afford Adequate Deterrence, and to Protect the Public

A sentence within the recommended Guidelines range would go far to promoting respect for the law and providing real deterrence.  Some persons may establish unlicensed money transmitting businesses with a laudable desire to service a discrete immigrant community.  A strong sentence will make many think twice about doing so.  Moreover, in this case, deterrence goes hand-in-hand with protection of the public.  Unlicensed money transmitters are a recognized danger.  For every person in Keleta's position who opts not to engage in the unregulated transfers of funds, the nation as a whole is better insulated against those who would take advantage of such businesses for improper purposes.

###         4.        The Need to Provide the Defendant with Educational or Vocational Training

The government acknowledges that Keleta is well-educated and that a term of incarceration would not aid in his intellectual development.

-14-

5.    **The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct**

A sentence of probation or one with only a modest period of incarceration would create unwarranted sentence disparity in comparison with the sentences received by like offenders convicted of violating § 1960.  This would be especially true in the case of defendants who have been convicted, like Keleta, after trial.  The government recognizes that several courts have engaged in Booker departures when sentencing individuals in § 1960 prosecutions, although these sentences all have occurred in cases in which the defendants have pled guilty.  However, even if the Court were to sentence outside the recommended Guidelines range, any sentence that still did not include a significant period of incarceration (although less than what the Guidelines called for) would be unreasonable and unfair to other defendants.

An important benchmark for the Court is Judge Urbina's recent sentence in Barry.  The defendant in Barry operated a money transmitting business in the District of Columbia under the name of Guinex International, Inc.[8]  Like Keleta, Barry knew that it was unlawful in the District of Columbia to operate a money transmitting business without a license.  The government's evidence showed that, between October 2001 and November 2004, Guinex transferred $15.5 million overseas, primarily to West Africa.  Judge Urbina used the table in § 2B1.1 and, as the Probation Office did here, set Barry's offense level at 26.[9]  After a reduction for acceptance of

---

[8]  The government's descriptions of other prosecutions is based on the parties' public filings in those cases and communications between government counsel and the prosecutors in the other matters.

[9]  Like Keleta, Barry had no prior criminal record.  Indeed, the government is unaware of any defendant sentenced for violating § 1960 whose criminal history category was greater than a category I.

responsibility, Barry's offense level was 23 and her Guidelines range was 46-57 months. After departing 6 levels under <u>United States v. Smith</u>, 27 F.3d 649 (D.C. Cir. 1994), to reflect Barry's status as a deportable alien, Judge Urbina sentenced Barry to 40 months of incarceration.[10] <u>See</u> <u>Barry</u> Judgment, attached as Exhibit 4.

Sentences in § 1960 prosecutions of defendants who have been convicted after trial include the following:

(a)    <u>United States v. Mohammad Bajwa</u>, No. AW-04-464 (D. Md.)

Bajwa was prosecuted for operating an unlicensed money transmitting business that serviced customers primarily in Maryland and Virginia. Bajwa transferred approximately $3.5 million in funds overseas. A jury convicted him of three counts of violating § 1960 and one count of wire fraud. Judge Alexander Williams sentenced Bajwa to 120 months of incarceration. <u>See Bajwa</u> Judgment, attached as Exhibit 5. In imposing such a lengthy sentence on Bajwa, Judge Williams was influenced by the fact that Bajwa absconded during the trial and was convicted and sentenced in absentia.

(b)    <u>United States v. Abad Elfgeeh and Aref Elfgeeh</u>, 03-CR-0133 (SJ) (E.D.N.Y.)

Abad and Aref Elfgeeh were convicted after trial of § 1960 violations in connection with their unlicensed money transmitting business that sent funds primarily to Yemen. As in this case, the offense conduct straddled the amendment to § 1960 in October 2001. Abad Elfgeeh was sentenced to 188 months of incarceration. <u>See Abad Elfgeeh</u> Judgment, attached as Exhibit 6. He was responsible for $22 million in transferred funds, which resulted in an offense level of 28. Abad Elfgeeh also received a 4-level enhancement under § 3B1.1 to reflect his leadership role in

---

[10]  Barry also forfeited $273,627 in assets and proceeds.

the scheme and a 2-level enhancement under § 3C1.1 as a consequence of his perjurious testimony at trial.  At an offense level of 34, the 188 month sentence was at the top of Abad Elfgeeh's recommended sentencing range.  Aref Elfgeeh received a 51 month sentence.  See Aref Elfgeeh Judgment, attached as Exhibit 7.  He was responsible for $1.6 million in unlawful transfers (offense level 22), and he also received a 2-level obstruction of justice enhancement.  His 51 month sentence was at the low end of his recommended range.

   (c)  United States v. Adonay Nolasco-Argueta, 02-20465-CR-KING (S.D. Fla.)

   Nolasco-Argueta was convicted after trial on two counts of conducting an unlicensed money transmitting business.  He was responsible for attempting to send approximately $165,000 to the Dominican Republic.  His offense level was 16 and he received a 24 month sentence, which was in the middle of recommended sentencing range.  See Nolasco-Argueta Judgment, attached as Exhibit 8.

   Sentences for defendants who have been convicted of violating § 1960 following guilty pleas include the following:

   (a)  United States v. Darr, 2006 WL 2645119 (D. N.J.) (September 16, 2006)

   Darr was sentenced after pleading guilty to conducting an unlicensed money transmitting business.  After acceptance of responsibility, his offense level was 23.  The court sentenced him to 46 months, which was the low end of his recommended sentencing range.

   (b)  United States v. Dominic Adu-Gyamfi (E.D. Va.) (October 20, 2006)

   Adu-Gyamfi, who was responsible for $28 million in unlawful transfers, was sentenced after pleading guilty to a year and a day in jail.  Government counsel was unable to determine the reasons for the sentence and could not locate any records on PACER.

-17-

(c)    <u>United States v. Sadik Monasser Omian</u>, 05CR80338-2 (E.D. Mich.)

Omian was convicted after a guilty plea of conspiring to violate § 1960, engaging in illegal financial structuring, and making false statements.  His offense level was 25, and the government was recommending a 57 month sentence, which was at the low end of the range. Judge Tarnow departed, invoking his discretion under <u>Booker</u>.  He sentenced Omian to a year and a day of incarceration.  <u>See</u> <u>Omian</u> Judgment, attached as Exhibit 10.

(d)    <u>United States v. Edi Mulyanto</u>, 05CR60320-COHN (S.D. Fla.)

Mulyanto pled guilty to violating § 1960 by running an unlicensed money transmitting business that sent funds to Indonesia.  He was responsible for approximately $3 million in unlawful transfers.  His sentencing range should have been 37 to 46 months.  The court granted him a small departure to 24 months of incarceration.  <u>See</u> <u>Mulyanto</u> Judgment, attached as Exhibit 11.  Government counsel was unable to reach the Assistant United States Attorney who handled the case.  The plea agreement is not available to the public, which often is a sign of a cooperation deal.

(e)    <u>United States v. Noor Alocozy</u>, CR-05-0279-DLJ (N.D. Cal.)

Alocozy pled guilty to violating § 1960 by running an unlicensed business that sent funds to Afghanistan.  He was responsible for $1 million in transfers.  The court sentenced him to 3 years of probation and 4 months of home confinement.  <u>See</u> <u>Alocozy</u> Judgment, attached as Exhibit 12.  The government can give the Court representations at the bench concerning the circumstances of this case.

(f)    <u>United States v. Habbal</u>, 2005 WL 2674999 (E.D. Va.) (October 17, 2005)

The defendant pled guilty to violating § 1960.  He admitted to sending $6.3 million to

Europe, Syria, and Lebanon.  His offense level, after a 3-level reduction for acceptance of

responsibility, was 21, with a recommended sentencing range of 37 to 46 months.  Using the 18

U.S.C. § 3553(a) factors, Judge Cacheris departed to a sentence of a year and a day.  Of

particular importance to Judge Cacheris was the fact that the defendant had always registered his

business with the Department of Treasury, although he never had obtained a state license.

       (g)    <u>United States v. Bariek</u>, 205 WL 2334682 (E.D. Va.) (September 23, 2005)

Bariek was responsible for unlawfully transmitting $4.9 million to persons in

Afghanistan, Pakistan, and Iran.  He pled guilty to violating § 1960.  Like <u>Habbal</u> above, his

adjusted offense level was 21.  Judge Cacheris, again relying on the factors set forth in 18 U.S.C.

§ 3553(a), departed and sentenced Bariek to 18 months of incarceration.

<u>**Conclusion**</u>

For the foregoing reasons, the Court should sentence Keleta consistent with the

recommendations in the PSR.

             Respectfully submitted,

             JEFFREY A. TAYLOR
             UNITED STATES ATTORNEY
             D.C. Bar No. 498610

     By:           /s/
             Jay I. Bratt
             Assistant United States Attorney
             Illinois Bar No. 6187361
             National Security Section
             Room 11-437
             555 Fourth Street, NW
             Washington, D.C.  20530
             (202) 353-3602
             Jay.Bratt@usdoj.gov

-19-

**<u>Certificate of Service</u>**

I, Jay I. Bratt, certify that I served a copy of the foregoing Government's Sentencing Memorandum on James W. Beane, Jr., counsel for the defendant by ECF this 22nd day of December, 2006.

_____/s/_____
Jay I. Bratt