IN THE
UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal Nos. 5:05CR00043 |
| v. | : | 5:05CR00048 |
| | : | 5:05CR00047 |
| AHMED HAJI ABDULLAH, | : | |
| AMIR RASHID, and | : | The Honorable Glen E. Conrad |
| RASHEED QADIR QAMBARI. | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by its attorney the United States Attorney for the Western

District of Virginia, offers the Court this Memorandum in Aid of Sentencing for the above-

captioned three defendants. As the Court is aware, defendants Ahmed Haji Abdullah and Amir

Rashid pleaded guilty before The Honorable B. Waugh Crigler on April 19, 2006, and March 2,

2006, respectively. Abdullah pleaded guilty to Counts One and Three of his Indictment. Count

One charges him with operating an unlicensed money transmitting business (generally referred

to as a "Hawala"), and Count Three is a forfeiture count. The government will move to dismiss

Count Two, which charges Abdullah with theft of public money, at his sentencing pursuant to

the plea agreement that has been filed in this case. Rashid pleaded guilty to both counts of his

Indictment. Count One charges him with operating an unlicensed money transmitting business,

and Count Two is a forfeiture count. Defendant Rasheed Qadir Qambari was tried by this Court

before a jury in Harrisonburg, Virginia. He was convicted by the jury on January 30, 2006, of

operating an unlicensed money transmitting business. The parties agreed to ask the Court to

decide Count Two of Qambari's Indictment at the time of his sentencing. Count Two is a

forfeiture count.

I.  The Law

Title 18, United States Code, Section 1960(a), which is part of the federal racketeering law, prohibits the operation of an unlicensed money transmitting business.  The statute punishes anyone who "conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business."  18 U.S.C. § 1960(a).  A money transmitting business is defined by the statute as a business:

> which affects interstate or foreign commerce in any manner or degree and –
>
> (A) is operated without an appropriate money transmitting license in a state where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable; [or]
>
> (B) fails to comply with the money transmitting business registration requirements under section 5330 of Title 31, United States Code, or regulations prescribed under such section; . . .

Id. at § 1960(b)(1).  The statute further defines "money transmitting" to include "transmitting funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier . . . ."  Id. at § 1960(b)(2).  Title 31, United States Code, Section 5330, requires anyone who is operating a money transmitting business to register with the Treasury Department no later than 180 days after the business is established.  Section 5330 also imposes administrative and record keeping requirements on lawful money transmitting businesses.

Section 1960(a) carries a potential sentence of five years in prison and a fine of up to $250,000.

II.  The Legislative History

The United States Congress passed the USA PATRIOT Act on October 25, 2001. The Act was signed into law by President George W. Bush on October 26, 2001. Within the Act, Congress amended the law at issue in these sentencings, Title 18, United States Code, Section 1960, and removed the mens rea requirement that a defendant prosecuted under Section 1960 be aware that his actions were unlawful. See USA PATRIOT Act of 2001, Pub. L. 107-56, § 373(a), 115 Stat. 272, 339 (2001). Thus, under the law as the Court applies it herein, a defendant must know that he is operating a money transmitting business and that he is not licensed. As noted below, this congressional change was intentional and made after careful deliberation.

The United States Senate debated the USA PATRIOT Act on October 25, 2001. Senator Paul Sarbanes (D-MD), the then Chairman of the Committee on Banking, Housing, and Urban Affairs, submitted a summary of the provisions that his Committee discussed that were subsequently included in the Act. Senator Sarbanes noted that the amendment contained in Section 373(a) "deal[s] with underground banking systems such as the Hawala, which is suspected of being a channel used to finance the al Qaeda network." 147 Cong. Rec. S10990, S11041-42 (2001) (statement of Senator Sarbanes).

During a September 26, 2001, hearing before Senator Sarbanes's Committee, Senator Evan Bayh (D-IN) noted in his introductory statement that:

> many experts feel that the most likely source of the funds used to perpetuate the attacks on the United States [on September 11, 2001,] were derived either from small wire transfers or from an informal banking system known as Hawalas. This system is used to transfer large amounts of money from one country to another without the cash ever crossing national boundaries . . . . [Under this system t]here is no need to smuggle large amounts of cash from one country to another or to fill out bank forms that can draw unwanted attention. No need, in fact, for any detailed bank records whatsoever . . . leaving virtually no paper trail to follow.

The Administration's National Money Laundering Strategy for 2001: Hearing Before the

<u>Committee On Banking, Housing, and Urban Affairs</u>, S. Hrg. 641, 107th Cong., 1st Sess., at 20

(2001) (statement of Senator Evan Bayh).  Drawing attention to regulations requiring registration

of Hawalas and similar financial structures, Senator Bayh noted, "[t]hese regulations . . . and an

extension upon them could be important tools in the hands of law enforcement in drying up the

funds available to terrorist organizations . . . ."  <u>Id</u>.  Senator Bayh further noted the need for a

"more hard-nosed approach" in enforcing statutes governing Hawalas and other illegal money

transferring activities.  <u>Id</u>.

    Later in that same hearing, Jonathan Winer, the former Treasury Department Deputy

Assistant Secretary for International Law Enforcement, described the potential for "the same

currency provided by good people for good purposes to take care of their parents," if transferred

through illegal means such as Hawalas, to end up in a general pot of money used by some

terrorist organizations.  <u>Id</u>. at 57.  Winer testified before Chairman Sarbanes' committee:

> Honest people at that point doing honest transactions, but it is totally anonymous.
> That anonymous money is now available to be used when an agent of bin Laden
> goes to that Pakistani or Dubai broker or anywhere else where the system is in
> place and says, here is $100,000.  I want this $100,000, or the equivalent thereof,
> to be made available to a fellow in Vera Beach who is going to use the password
> pilot.  The person in Vera Beach uses the password pilot and now has currency,
> the same currency provided by good people for good purposes to take care of
> their parents.

<u>Id</u>.  Winer offered the Committee his recommended steps to combat terrorism.  One of these was

that Congress should "register and regulate money service businesses, including Hawala

institutions . . . ."  <u>Id</u>. at 51.  Winer went on to state that, "[t]o be effective, these laws must then

be vigorously enforced."  <u>Id</u>.  Stuart Eizenstat, the Treasury Department's former Deputy

Secretary, noted that a necessary tool for fighting terrorist financing is "[i]nvestigation and

blocking of underground banking practices such as the 'Hawala,' through which a potentially

significant portion of terrorist funds is thought to pass into or out of the United States without ever touching the formal banking system." Id. at 87. William Wechsler, former Special Adviser to the Department of the Treasury, noted that regulatory tools requiring registration of Hawalas and similar banking methods should be utilized by the FBI to thwart the efforts of "suspected terrorist moneymen" that benefit from anonymous monetary transmissions. Id. at 91.

The House Committee on Financial Services also considered and addressed various amendments to, and restrictions on, unlicensed money transmissions. At an October 3, 2001, hearing before Chairman Michael Oxley (R-OH), Congressman Oxley highlighted the goal of "bolster[ing] law enforcement's ability to find and destroy the financing of terrorist organizations, whether in banks or in underground 'hawala' systems." Dismantling the Financial Infrastructure of Global Terrorism: Hearing Before the Committee on Financial Services, H.R. Hrg. 46, 107th Cong., 1st Sess., at 2 (2001). Later in that hearing John F. Moynihan, a former D.E.A. Special Agent and an authority on money laundering and financial crime, described the difficulty faced by prosecutors in utilizing Section 1960 under the now obsolete form that required knowledge by a defendant that his actions were illegal: "The statute says, if . . . you knowing[ly] violate it, then you can be federally prosecuted . . . if it cannot be affirmatively shown that the account owner knew there was a requirement to be licensed, he cannot be prosecuted . . . . Developing evidence in these complex international cases is extremely difficult." Id. at 201. Moynihan went on to urge the Committee that "[t]he elimination of the 'I didn't know' defense must be included" in any legislation passed by Congress regarding Section 1960. Id. at 202. Doing so, Moynihan said, would "significantly hinder persons who are engaging in underground banking from delivering monies." Id. For those that want to send

money within the system, Moynihan stressed that, "[p]ersons seeking to send relatives money home can and should use the various options available to them.  The options are formal banking channels, wire transfer stores, etc . . . .  All these channels are subject to regulatory oversight from various federal, state, and local agencies."  Id.

Chairman Oxley later reported to the House a section-by-section analysis of the legislation proposing amendment of Section 1960 in which he noted that amendment "makes clear that an offense under Section 1960 is a general intent crime for which a defendant is liable if he knowingly operates an unlicensed money transmitting business . . . .  [T]he Government would not have to show that the defendant knew that a . . . license was required."  H.R. Rep. No. 250, 107th Cong., 1st Sess., pt. I, at 54 (2001).  Earlier in that same report, the Committee noted that the September 11, 2001, "terrorist operatives used thousands of dollars in cash for expensive flight school training, paid their rent with checks drawn on local American banks, bought airline tickets over the Internet with credit cards, and engaged in numerous other financial transactions." Id. at 34.  While some of that money may have been obtained through petty crime in the United States, "experts believe that a major share of terrorist financing is conducted through international cash couriers as well as through informal banking systems, like the . . . hawala . . . . These underground systems are exploited by terrorists . . . because of the lack of record-keeping and opportunity for anonymity."  Id.

In sum, Congress and the President, by enacting the USA PATRIOT Act, strengthened this portion of federal law in an effort to eradicate these illegal financial businesses.  The unregulated Hawalas had been exploited by criminals and terrorists and posed a threat to America's security.  Congress and law enforcement determined that such exploitation had

occurred in cases where the Hawala broker was part of the criminal enterprise or was an unwitting participant. As noted above, one aspect of congressional thinking on this change was that people who run unlicensed money transmitting businesses, even if they were not knowingly supporting criminal or terrorist activity, could be duped into hiding or laundering money that would end up supporting crime. In addition, Congress stressed the importance of aggressive prosecution of people who operate these illegal financial businesses.

III.    Reporting for Lawful Money Transmitting Businesses

Both the Commonwealth of Virginia and the federal government regulate money transmitting businesses. In Virginia, someone who wishes to operate a lawful money transmitting business must apply to the Bureau of Financial Institutions, which is part of Virginia's State Corporation Commission. A blank application is attached for the Court's review as Attachment A. As can be seen, this application is detailed and provides the state with significant information about all such new businesses. A lawful applicant must pay a $500 application fee and post a $25,000 surety bond. In addition, once the state business is operating, there are quarterly, semi-annual, and annual, reporting requirements for the business. See Attachment B. These reports require lawful transmitting businesses to document information about their transactions. The law also requires lawful businesses to report all agents who are operating on the business's behalf.

The federal government requires a lawful money transmitting business to register with the Department of Treasury, which posts guidance for businesses that wish to comply with the law and regulations. See Attachment C. The initial filing is done by FinCEN Form 107. Id. After this initial registration, lawful money transmitting businesses must provide a two-year

update of their registration.  See id.  Title 31, United States Code, Section 5330, requires that

lawful businesses (a) list who owns the business, (b) list who sits on any board of directors, (c)

state where the business keeps an account with a depository institution, (d) estimate the level of

business for the upcoming year, (e) maintain a list of agents associated with the business, among

other reporting requirements.  Id. at § 5330(b) and ©.

Defendants Abdullah, Rashid, and Qambari, failed to comply with any of these federal or

state reporting requirements.

IV.    The Investigation

In March 2003, an FBI Joint Terrorism Task-Force began an investigation into multiple

suspicious international and interstate financial transactions.  From extensive financial data, the

task-force was able to determine that a number of the brokers for these transactions lived within

the Court's jurisdiction, specifically in the Harrisonburg, Virginia, area.  According to the

investigation, over $2.5 million had been sent overseas by persons residing in the Harrisonburg

region in a relatively short period of time.  The funds were generally sent by wire transfer, and

these transfers were in large dollar amounts, up to $50,000 at a time.  One of the initial

investigative steps taken by the task-force was to determine if any of the people who were

transmitting this money were registered as required by law with the federal Treasury Department

and Virginia's State Corporation Commission.  None were.  Based on the review of the financial

data that could be obtained, a number of the transactions appeared unusual.  For example, a

significant portion of the money transferred went to a company, M.J. Trading, that did business

in Turkey, among other places.  The money then appeared to go to other individuals who had

some relationship with this company.  Then, finally, the money went to other unknown

individuals. Attachment D provides the Court with a rough schematic of the financial trail for some of the money relevant to the Court's decision herein. M.J. Trading is a company about which very little could be determined through publicly available means and other investigative efforts. This caused further concern for the task-force. In investigating M.J. Trading, as well as the company's corporate officials, the task-force found, among other things, no financial data, or other information, indicating that M.J. Trading had any dealing with Kurdistan, which is in the northern part of Iraq. In addition to M.J. Trading, another company, S. Trading, also appeared to serve as a funnel for some of the money being investigated. Money was transferred from the United States to S. Trading. This money then appeared to be transferred to M.J. Trading before being further transferred to people unknown. S. Trading, like M.J. Trading, remained a mystery to the task-force, although it was determined that the company operated a telecommunication business of some sort. Both the odd structure of these financial transactions, as well as the intelligence excerpted above, prompted the task-force to continue its examination of all available data.

After a full financial investigation, the task-force obtained search warrants from a federal judge in the Western District of Virginia authorizing the FBI to search a number of residences in the area, including the homes of the three defendants in this matter. As is noted below, all three of these defendants agreed to be interviewed by agents from the task-force.

V.    United States of America v. Ahmed Haji Abdullah

The proffer of evidence offered by the government at the time of Abdullah's guilty plea is included as Attachment E for the Court's convenience. The amount of money remitted that is set forth in this proffer includes only the time period between October 26, 2001, when Section

1960 was amended, and October 19, 2005, when the Indictment was returned.

On August 5, 2004, Abdullah was interviewed by law enforcement. During this interview defendant stated that after he had moved to the Harrisonburg, Virginia, area, in 1999 he was contacted by a person that he knew only as "Ismael." Defendant did not know the rest of Ismael's name. Defendant said that Ismael was rich and lived overseas. According to defendant, Ismael asked defendant to collect money from people in the United States to be sent out of the country. The plan was for defendant to get one percent of the money collected. Ismael, in turn, would keep four to five percent as his fee. Defendant said that they began this business relationship, and he collected money from people here in the United States and sent it somewhere overseas where it would be turned into goods. Abdullah said that these goods were purchased by various "companies" and sold in various places overseas, sometimes in Kurdistan. Defendant said that the amount intended for each recipient was provided to them by his partner overseas, and the company kept whatever profit was realized over and above that amount. Defendant said that between late 1999 until late 2002 or early 2003, he sent an average of $30,000 monthly through this method. Defendant said that he did not know many of the people for whom he was sending this money, and he said that he sent money overseas for many different people. He said that he sent money at various times to a number of locations, including the United Kingdom, Turkey, Dubai, Kuwait, and Jordan. He said that he generally did wire transfers using the Arab Bank in New York and had the money sent to an Arab Bank branch in one of those countries. Defendant indicated that he sent money to various people and businesses overseas. He said that he did not know all of the people to whom he sent this money or for whom he was sending it.

Regarding the money that was transferred by Abdullah, Attachment F provides a summary of some of the amounts that were wire transferred by defendant during the period about which he spoke in his interviews with law enforcement. Attachment F also provides the Court with some of the recipients overseas who distributed the money for defendant.

Pursuant to Abdullah's plea agreement and because of his truthful admission of his criminal conduct, the government requests that the Court impose a probationary sentence in this matter and order the forfeiture amount set forth in Attachment E, $3,130. The government also requests that the Court impose a special assessment of $100 pursuant to Title 18, United States Code, Section 3013.

VI.    United States of America v. Amir Rashid

The proffer of evidence offered by the government at the time of Rashid's guilty plea is included as Attachment G. As with Abdullah, the amount remitted as set forth in this proffer includes only the time period between October 26, 2001, when Section 1960 was amended, and October 19, 2005, when the Indictment was returned.

On August 5, 2004, Rashid was interviewed by law enforcement. At that time he indicated that prior to his conduct at issue in this matter, he knew defendant Abdullah through a business transaction. Rashid said that in 2002 Abdullah took a trip to Kurdistan, and he asked Rashid to continue his money transmitting business for him while he was gone. Rashid agreed to do this using his own bank account. Rashid indicated that Abdullah would charge five percent for transferring money for others. Rashid told the agents that when Abdullah left for Kurdistan, Rashid began to collect money from people to transfer. He said that he received cash, checks, and money orders, from his customers. The checks and money orders were made out to him and

he deposited these in his account prior to transferring the funds to other countries in large sums. He said that he kept the addresses and telephone numbers of the intended recipients. He said that he gave this ledger and the five percent service fee to Abdullah when he returned from overseas. Regarding the structure of the transactions, Rashid said that he would wait until he had a large amount to transfer before he transmitted the money to the contacts overseas. He said that he conducted at least three or four large transfers in amounts of at least $20,000. The amount of money and the identities of the intended recipients were sent to a contact in the United Kingdom, Kuwait, or Jordan, depending on the percentage charged by those contacts. Rashid said that he could not recall the names of these contacts without the ledger book, which he no longer had at the time of this August 2004 interview.

Rashid opened his account for this business in 2002 by depositing $27,498.46. On the same day that he opened the account he withdrew $27,359.30 from the same account. The task-force was never able to explain this transaction. Attachment H provides a summary of some of the amounts that were wire transferred by defendant during the period about which he spoke with law enforcement. Attachment H also provides the Court with some of the recipients overseas who distributed the money.

Pursuant to Rashid's plea agreement and because of his truthful admission of his criminal conduct, the government requests that the Court impose a probationary sentence in this matter and order the forfeiture amount set forth in Attachment G, $1,018. The government also requests that the Court impose a special assessment of $100 pursuant to Title 18, United States Code, Section 3013.

VII.    United States of America v. Rasheed Qadir Qambari

Qambari was interviewed by law enforcement on August 5, 2004, and again on August 17, 2004. During the August 5, 2004, interview Qambari said that he had a personal account at Wachovia bank, and he was able to remember the bank account number without looking at his banking records. He also said that he had a Bank of America account that he used for his money transfer business. He indicated that this was a business account. He provided the FBI with a notebook that he stated contained the records from his business. This notebook was admitted into evidence by the Court during Qambari's trial as Exhibit 3. When asked how much he had transferred during the time he operated this business, Qambari said that he was not sure. When asked if $170,000 sounded about right, he said that he thought that it was less than that but that if that is what the FBI had calculated, he would not say that it was wrong. Qambari said that people would call and ask him to send money to people in Kurdistan. Qambari said that these customers would usually send him checks or money orders, but on occasion they would give him cash. He would deposit this money in the Bank of America account. He said that he would then wire the money to a bank in Turkey to a man named Mohamad Rasheed who Qambari then described as a business man. Qambari said that he charged a five percent fee to transfer the money. He said that he would get one percent and Rasheed would get four percent. Special Agent Bradley S. Gregor testified about this statement during Qambari's trial.

On August 17, 2004, Qambari basically reaffirmed the statement he made during the August 5, 2004, interview, except he said that he sent the money to Gafur Rasheed who Qambari said is Mohamad Rasheed's son. In addition, Qambari said that he transferred approximately $170,000 while he was operating this business. Qambari again reaffirmed the percentages that Gafur Rasheed and Qambari received for their services. Qambari also said that he understood

-13-

that all he needed to transfer money legally was a business license.  He claimed that he paid $50 to obtain a license from the City of Harrisonburg.  Special Agent Stephen J. Duenas testified about this second, August 17, 2004, statement during Qambari's trial.

In addition to these two statements, Qambari exercised his right to testify at his trial. Portions of his testimony may be helpful to the Court.  First, Qambari testified that he was not operating a business.  Tr. 4, 8, 11.[1]  Qambari also testified that Special Agent Gregor was not truthful when the agent testified.  Tr. 10, 12.  Specifically, Qambari said that Agent Gregor was not truthful when he testified that Qambari told Agent Gregor that the Bank of America account was his business account.  Id.  When asked, "You told him that this account was your business account, is that right?," Qambari answered, "Never happened."  Tr. 10.  Qambari also denied any memory of telling Special Agent Duenas that he had obtained a business license from the City of Harrisonburg for $50.  Tr. 15 (" . . . I don't remember I made that statement.  With all respects to Mr. Duenas.").  As the Court will recall, defendant gave the jury this denial only after trying to avoid the question for some length of time.  See Tr. 13-15.  Qambari also claimed that he was simply sending money through a "Hawalla" (sic) (Tr. 11) relationship to his family and others' families.  Tr. e.g., 2, 7, 11.  Qambari tried hard during his testimony to convince the jury that all of his customers were family members or close friends.  When asked how he knew one customer who lives in Tennessee for whom Qambari transferred over $10,000, Avdal Wasnan, he testified that, "his mother and my mother are relative, far relative, but not very close relative, far relative."  Tr. 16.  Nevertheless, Qambari finally did admit that he was not remitting money just

---

[1]      The January 30, 2006, transcript of Qambari's testimony is included as Attachment I for the Court's convenience.

for relatives.  When asked about a customer named Ahmad Wesi, Qambari admitted:

> Sir, if you go name by name, maybe I don't know personal the name.  How things work, I know the gentleman down in Harrisonburg.  I helped him one time to get the money for his family and he knows somebody in northern Virginia and he said well, Rasheed [Qambari] help me.  Okay, I was going to send him – can you ask him please to send this money for my family, too.  Maybe I don't know exactly personally who they are, where their phone number is.  I really don't remember name.

Tr. 18.  This passage effectively highlights congressional concerns about unregulated money transfers overseas.  Qambari has no personal knowledge about this customer who he referred to as "somebody in northern Virginia."  This customer, Wesi, is a friend of one of Qambari's acquaintances.  Defendant does not know to whom this customer was sending money through him.  Lastly, neither the state nor the federal government had any idea that Qambari was performing this banking service for people.  As can be seen from Attachment J, Qambari was sending thousands of dollars through places like Turkey and Jordan.  This money, by his own admission, was then further transferred to others unknown to him.  In fact, as was clear from his testimony at trial, Qambari knew little or nothing about the people to whom he was sending these large money transfers.  During his direct testimony, he talked about "that gentleman" who he described as "a rich man."  Tr. 2.  When asked during cross-examination about this middle-men/partner, Qambari, answered that "Mohammed Rasheed is the guy that live in Kurdistan, but his son, Raphael.  I never meet his son."  Tr. 7.  As can be seen from Attachment J, much of the money being sent by Qambari went through the Gafur Rasheed who defendant referenced in his August 17, 2004, statement to Agent Duenas.

The government can offer the Court no evidence regarding the final destination of the over $2.5 million that was transferred by Qambari and others that were investigated in this

matter.  Nevertheless, neither can the defendants.  This is the danger of unlawful and informal banking systems.  Qambari claims that the banking system in Kurdistan is poor and unregulated.  That is not true in the United States, and failures in another system do not relieve people from following this country's laws and regulations.  Qambari was not truthful when he testified during his trial, as was determined by the jury, and this causes the government great concern.  Based on his lies and failure to accept responsibility for his criminal conduct, or demonstrate any remorse whatsoever, the government asks the Court to sentence Qambari to a period of incarceration.  In addition, the government requests that the Court find Qambari guilty of Count Three, which is consistent with the jury's verdict, and order him to pay $5,549.  Such judgment is appropriate based on the government's evidence, including defendant's own statements, wherein he indicated that he and at least one of his partners in the Middle East were making a five percent profit from this business.  The government also requests that the Court impose a special assessment of $100  pursuant to Title 18, United States Code, Section 3013.

The United States respectfully offers this memorandum and its attachments to the Court in aid of its sentencings in this matter.

Respectfully submitted,

JOHN L. BROWNLEE
United States Attorney


s/ William F. Gould
William F. Gould
Assistant United States Attorney

<u>C E R T I F I C A T E</u>

I certify that on June 23, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and that this system will send notification of such filing to defendants' counsels, Mr. David McCaskey, Mr. Darren Bostic, and Mr. Lloyd Snook.


 s/ William F. Gould
William F. Gould
Assistant United States Attorney