# EXHIBIT 2

Received
Mail Room

SEP 1 3 2007

United States Court of Appeals
District of Columbia Circuit

# SUPPLEMENTAL

UNITED STATES COURT OF APPEALS

DISTRICT OF COLUMBIA CIRICUIT



APPEALS COURT CASE NO. 07 - 3021

UNITED STATES OF AMERICA

APPELLE

V.

KESETBRHAN M. KELETA

APPELLANT

SUPPLEMENT

OF

BRIEF OF THE APPALLANT

APPEAL FROM THE JUDGMENT ENTERED

IN THE UNITED STATES COURT OF APPEALS

DISTRICT OF COLUMBIA OF CIRCUIT

FEBRUARY 7, 2007 AT APPEALS NO. 07 - 3021

KESETBRHAN M. KELETA

PRO SE

BOP # 28889-016 , MVCC - D6

PHILIPSBURGH, PA 16866

September 4, 2007


Nancy G. Dunn
Deputy Special Counsel
United States Court of Appeals
District of Columbia
Washington, DC, 2001

                    Case No. 07-3021, United States V. Keleta

Dear Mrs. Dunn,

        Enclosed please receive the <u>Argument, Table  of Authorities</u>
<u>and other updated some of the issue s related documents, which are</u>
part of the Brief documents. I hope you have received by now the
<u>Brief of the Appeal</u>. In addition to this, as we have discussed the
issue of the Court appointed appellant counsel through the letters,
I have not received nor heard from any one that representing me as
of now.
        Regarding the documents of the brief, I do not have any cash
available on my account that could able me to make required copies,
and there is no jobs in this prison compare as other ones. I do
teach economic class but the pay is as low as $ 20.00 or less.
Therefore, I would like you to make enough copy to the U.S. attorney
and I am including all addtional documents with this package.
        Thank you very much for your cooperation.


Enclosure :                          Respectfully, Submitted
( Brief Argument & other )
    7 Exhibits
                                     Kesetbrhan M. Keleta
                                          PRO SE


                    1- of - 41

Received
Mail Room

SEP 1 3 2007

United States Court of Appeal
District of Columbia Circuit

TABLE OF AUTHORITIES

1. The issue to Dismiss the indictment : PAGE 11

   a) Harvey V Vandergrift, Church of Christ V. McDonald 180, and

     Ure V Ure 185 111 216

   b) State V La Page 57 NH 245

   c) United States V Zanger 848 F.2d 923

   d) United State V Givens 767 F.2d 574

   e) United States V Penn 974 F.2d 1026 1028


2. The issue of the Confidential Source : PAGE 13

   a) United States V Jackson, 384 F.2d 825 ( 3rd Cir 1967 )


3. The issue of the Grand jury : PAGE 19

   a) Wardius V Orgon, 412 US 470 37 LED 2d 82

   b) United States V Gordon, 290 F.3d 539

   c) United States V La Felice 978 F.2d 92 94 ( 3rd Cir 1992 )


4. The pretrial preparation : PAGE 43

   a) Lows V Armontrout 863 F.2d 1377 1385 ( 8th Cir 1988 )

   b) Eldrige V Athins 665 F.2d 228 237 n.5 ( 8th Cir 1981 )

   c) Kimmelman V Morrison,43 477 US 365 91 L ED 2d 305 1986

   d) Strickland V Washington, 466 US 668 690,80 L ED 2d 674, 104

     S Ct 2052 ( 1984 )


5. The issue of the plea agreement : PAGE 45

   a) Strickland V Washington, ( 1984 ) 466 US 668, 80 L ED 2d

     674, 104 S Ct 2052

   b) Rompilla V Beard ( 2005, US ) 125 S Ct 2456, 162 L ED 2d 360

   c) United States V Khan , 2004 ED NY 325 F. Supp 2d 218

PART  1 - of  PAGE 4

6. The issue of the Expert : PAGE 47

7. The issue of the Statue of 18 U.S.C. 1960 : PAGE 50

    a) Baker V State 120 W.S 135 97 NW 566

    b) United States V Johonson 971 F.2d 562

    c) United States V Montoya , 945 F.2d 1068

    d) United States V Farhad Talebenjad 342 F. Supp 2d 346 2004

    e) United States V Louay Habbal , 01: 05CR083 ( Jcc )

    f) United States V Mohummed Islam UDDIN , 365 F. Suup 2d 825 2005

    g) United States V Ali Sher Khan, 325 F.Suup 2d 218 2004

    h) United States V Sammr Ahmad Rahman , 417 Supp 2d 725 2006

8. The issue of Control, Manage, Supervise : PAGE 54

    a) State V LApage 57 NH 245

    b) Harvey V Vanderjrift

    c) United States V Blomberg , 961 F.2d 787 791

    d) United States V Manuel 912 F.2d 204

    e) United States V Harry, 960 F.2d 51

    f) United States V Turkett, 452 US 576 69 L ED 2d 246, 101 SCt 2524 ( 1981)

    g) United States V Brown , 583 F.2d 659 ( 3rd Cir 1978 )

    h) United States V Tarnopol, 561 F.2d 466 ( 3rd Cir 1977 )

    i) United States V Dansker, 537 F.2d 40 ( 3rd Cir 1976 )

    j) United States V Rockelman , 49 F.3d 418 195

    k) Riccobene , 709 F.2d at 222

9. The issue of the Closing Argument : PAGE 61

    a) United States V Iglesias, 915 F.2d 1524

    b) United States V Bowman , 353 F.3d 546

10. The issue of the prosecutorial Misconduct : PAGE 63

    a) Barrievts , 221 F.3d 9 753

PART 2

b) United States V Biberfield, 957 F.2d 98 102

c) United States V Smith, 294 F.3d 473, 477 ( 3d Cir 2000 )

d) United States V De Rosa 783, F.2d 1401 1404 ( 9th Cir        )

e) Kyle V Whitley , 514 US 419, 433 n.7 131 L ED 2d 290

f) United States V Agurus , 427 US 97 103 96

g) Spence V Johonson 80 F.3d 989

h) People V Shields 186 327

i) United States V De Rosa 783 F.2d 401, 1404 ( 9th Cir

11. The issue of the Guilty by Association : <u>PAGE 66</u>

a) Johonson 552 A 2d at 516

b) Rosmald Winfield, 676 A. 2d 1 at 5

c) Fiore V White , 531 US 225 , 228-29 ( 2001 )

12. The issue of the Sentencing Disparity : <u>PAGE 71</u>

a) United States V Sakedo LEXIS 12400

b) United States V Doe 398, F.3d 1254

c) United States V Sclwarz 500 F.2d 1350

d) United States V Flores Ortega ( 2000 US ), 145 L ED 2d 985

120 S Ct 1029

13. The issue of the ineffective Assistance of Counsel : <u>PAGE 74</u>

<u>a</u>) United States V Easter , 539 F. 2d 663 ( 8th Cir 1976 )

b) United States V Indelicato, 800 F.2d 1482, 1483 ( 9th 1986 )

c) Evitts V Lucey ( 1985 ) 469 US 387, 83 L ED 2D 821

d) Smith V Murray ( 1986 ) 477 US 527 , 91 L ED 2d 434, 106 S Ct

f) Entsminger V Iowa ( 1967 ) 386 US 748, 18 L ED 2d 501 87 S Ct 1402

g) United States V Cronic ( 1984 ) 466 US 648, 80 L ED 2d 657

104 S Ct 2039

h) William V Washington 59 F.3d 673

i) Scott V State 477 S.E 2d 901 903

PART 1 - of PAGE 5

14. The issue of the failure to file a required papers for Appallet <u>PAGE 83</u>

    a) Gideon V Wainright , 1963 372 US 335

    b) Entsminger V Iowa, 1967 368 US 748 18 L ED 2d 501 87 S Ct 1402

    c) Doglas V California ( 1963 ) 372 US 905, 10 L ED 2d 2000,

       83 S Ct 1288

    d) Bashor V Risley ( 1984  CA9 Mont ) 730 F. 2d 1228

    e) Dillon V United States ( 1962, CA9 ) 307 F.2d 445

    f) Penson V Ohio

    g) Smith V Bennett ( 1961 ) 365 US 708,6 L ED 2d 39 81 S Ct 895

    h) Supreme Court- Case , 83 L ED 2d 1112, 18 L ED 2d 1420, LEd

       2d 1260, 2 L ED 2d 1644, 15 AIR 582

15. The issue of Arrest : NEW ADDITIONAL PAGE

    a) Mastroianni V Bowers, 160 F. 3d 671 ( 11th Cir 1998 )

## THE ISSUE OF THE ARREST

**The** defendant alleged that the arrest pursuant to grand jury indictment violate his Fourth Amendment becuae the grand jury was mislead or experienced under pressure according the grand jury testimony. When the defendant arrived on the summer of 2002 form Asmara, he was interviewed for over 2 hours by the ICE homaland Security agents. And the defendant answered all the questions the agents asked him with out any hesitation. And he gave all the information about his business and phone number and willing to assist the agents any time. However, the agents never asked the defendant if there was a business by the name of Himbol Finacial  on 600 L street under the Eritrean Community centre. The defendant told the agents about the embassy of Eritrea and the agent Mr. Austin told him, we are not involved in diplomatic issues and the US foreign office is the one that handles.

The defendant didn't know that the agents already discuss the issue with the confidential source about the activity of the embassy. The agents never mentioned the name of <u>HIMBOL FINANCIAL SERVICE, PLC</u>, located in 600 L street nor if it existed any where in District of Columbia. The defendant also explain the relationship of his company with the government of Eritreaand he travels back and forth to follow up his porjects. The agents were aware and planed the interview with the defendant, but the defendant with out any counsel he was willing to share what he know and also invited to see his operation at any time. The defendant and his agent or the confidential source had over 2 hours of discussion and interview about the operation and yet the defendant had no idea that the confidential source already talked to the agents. During the interview the confidential source Mr. Bishop never mention about the illegality of the embassy operation nor the 600 L street.

1 - OF - 2

The confidential source at this time, he was getting paid by the defendant to consult him, to process all kind agency, government, license registration, representing the defendant to answer any issue about the operation with the Eritrean Embassy, opening bank accout and tax form for the new corporation that will take the project of the Eritrean Embassy and reporting and discussing the issues with the defendant. And the confidential source or Mr. Bishop, never told the agents, that he advice the defendant, no to go to 600 L Street work with the Eritrean Embassy or Eritrean Government. However, in the trial he lied by saying that in his word " I TOLD Mr. KELETA NOT TO GO TO THE ERITREAN COMMUNITY ".

The confidential source also made reamrks that him and the defendant should not discuss issues on the phone regatding theembassy but the defendant was very surprised and told Mr. Bishop since when you are saying this, and we have noting to hide, we have to be truth-full with the agents and the governemnt. And eventhough the defendant was going back and forth to ERitrea, Africa for his project he was never discuss with any one about the investigation and the agent be able to accomplish thier goal. After all this efforts of cooperation the prosecutor, to conceal all the real information about the evidence and mislead the grand jury as if the prosecutor had no idea about the TRUTH OF THE EVIDENCE IS IMPROPER and subsquently to indict the defendant falsely and issue arrest warrent based unexisted company when infact there is evidence any one as Eritrean- American citizen pay to this company to transfer its find on his or her behalf, as the District of Columbia Banking Commission discribes as unillegal money transfer business. See. Mastroianni

2 - OF - 2

## TABLE OF CONTENTS

1. letter to Deputy Special Counsel ----------------------------- 1

2. Table of Authorities ------------------------------------------ 4-5

3. Back Ground and History of the Eritrean Embassy Operation ---- 6-10

4. Summary of the Arguments ------------------------------------- 11

5. Arguments  :-

    1) Whether the defendant is responsible or had any kind of authorization, to obtain a license, under the Section of 25 - 551- 03 District of Columbia Banking & Finn. Code, Subsection A§ 26-1001 and up to A§ 26-1026 for money transmitting business and Section A§ 26-1006 a requirment to Obtain a License.

    2) Whether the defendant had any kind authorization to represent the Eritrean Embassy operation a government Owned and Operated operation. And had the defendant a responsibility to report to Superintendent [Commissioner] under Subsection, A§ 26-1011 Special reporting requirment.

    3) Whether the defendant had any kind authorization or responsibility to keep the records of the 12 years operation activity of money transfer and other finacial services of Eritrean Embassy.

    4) Whether the defendant had any kind of authorization to represent the Eritrean Embassy, had there was a Company or a license under the Subsection A§ 26-1012, when he is not an owner nor he had a control or shares of the businesss, to obtain an approval for any change of Control or ownership.

    5) Whether the defendant had a responsibility or an authorization to receive any administrative CEASE AND DESIST, proceeding if the Superintendent [ Commissioner ] determine, that the licensee, A PERSON REQUIRED TO HAVE A LICENSE UNDER THIS CHAPTER, or an

2 - of - 41

authorized delegate has violated, is violating or is about to
violate any provision of the rules and regulation or order
imposed by the Superintendent [ Commissioner ] or written
agreement entered into with the Superintendent [ Commissioner ],
pursuant this chapter Subsection A§ 26-1001 up to A§ 26-1025 and
the section  A§ 25-551-03, that regulate the District of Columbia
Banking and Financial Services

     6) Whether the defendant had an authorization or any respo_
nsibility, to register the Embassy Of Eritrea with the Secretary
of Treasury department, no later than the end of 180- day period,
begining on the later, according the 31 U.S.C. A§ 5330 registration
of money transmitting business, or responsible to claim of any thing
seized during the raid the funds or other records. However, the
Eritrean Embassy claimed to the United States , State Department
that, the (Approx) $ 850,000.00 fund was in deed the property of
the Eritrean Government.   ----------------------------------------- 12

6. Table of Contents ------------------------------------------------ 2-3
7. Exhibits
     1. The initial legall counsel letter for the defendant and the
       law firm that advised him and incorporate his business and
       advised him not to testify or appear in the grand jury.
       However, later on after indictment the firm or the counsel
       told the defendant the arrest warrant was violating your
       rights and we do not practice a Crimnial law, which is after
       a long wait more than a year, the defendant gave them when
       he received a letter of investigation ( a target investigation).

     2..The second exhibit about the issue of grand jury

     3. The third exhibit about the restaurant the defendant and his
       wife, opened because , they could not travle to Africa to work
       on their project due to grand jury and court proceedings.
     4. The fourth the defendant conviction and U.S. Attorney remarks.

## TABLE OF AUTHORITIES

CASES :

1. United States V. Park, 421 U.S. 658, 673, 44,L.ED.2d. 489, 95
   S.Ct 1903 ( 1975) -------------------------------------------- 23

2. United States V. Jorgensen, 144 F. 3d 550, 560 (8th Cir 1998) --- 23

3. United States V. Amrep Corporation, 560 F.2d 539, 545 ( 2d Cir
   1977) -------------------------------------------------------- 23

4. United States V. Schlei, 122 F.3d 944, 971 ( 11th Cir 1997)----- 23

5. United States V. Kyle, 257 F.2d 559, 563 ( 2d Cir 1958)_____ 23

6. CF.Fede V. The Videotrip Corp., 697 F. Supp., 1165 1177
   ( D. Colo. 1988 )-------------------------------------------- 23

7. United States V. Lanier, 520 U.S. 259, 266, 137, L.ED. 2d.
   432, 117, S. Ct. 1219 ( 1997 ) ----------------------------- 24

8. Velastegni, 199 F.3d at 593  ------------------------------- 24

9. Reisch V State of Maryland, 107 Md. App. 464, 668, A.2d 970
   ( 1995 ) --------------------------------------------------- 25

9. Gamett, 332 Md. 571, 578, 632, A.2d 797 ( 1993 ) _____ 26

10. Dawkins,313 Md. 638, 644-645, 547 A.2d 1041 ( 1988 ) _____ 26

11. State V. McCallum, 321 Md. 451, 456, 583, A.2d 250 ( 1991 )_____ 26

12. Hary Berenter, Inc V. Berman, 258 Md. 290, 294, 265, A.2d 759___ 26

13. Hoey V. State, 311 Md. 473, 492, 536, A.2d 622 ( 1988 )_____ 26

14. Brown V. State 285 Md. 469, 474-75, 403 A.2d 788 ( 1979 )_____ 26

15. Cover Talia Ferro, 142 Md. 586, 596, 122 A. 2d. ( 1923 )_____ 26

16. Shell V State, 307 Md. 46, 66, 512 A.2d 358 ( 1986 )_____ 27

17. In RE Takac, 331 Md. 80,84,626, A.2d 366 ( 1993 ) _____ 27

18. Resenberg V State, 164 Md. 473, 476, 165 A. 306 ( 1993 ) _____27

19. Morissette V. U.S. , 342, U.S. 246, 250, 96, L. ED. 288, 72
    S. Ct. 240 ( 1952 ) ---------------------------------------- 28

## TABLE OF AUTHORITIES

AUTHORITIES :

PAGE

1. 18 U.S.C. A§ 1960 ------------------------------------------ 15

2. 31 U.S.C. A§ 5330 ------------------------------------------ 16

3. D.C. FIN. INS. LAW A§ 26 - 1001 --------------------------- 13

4. A§ 26 - 1002 ---------------------------------------------- 13

5. A§ 26 - 1009 ---------------------------------------------- 21

6. A§ 26 - 1003 ---------------------------------------------- 21

7. A§ 26 - 1006 ---------------------------------------------- 14-17

8. A§ 26 - 1011 ---------------------------------------------- 18

9. A§ 26 - 1012 ---------------------------------------------- 18

10. A§ 26 - 1024 --------------------------------------------- 19

11. A§ 26 - 1022 --------------------------------------------- 19-20

12. Fletcher Cyclopedia For The Law of Private Corporations--------- 22

13. 31 U.S.C. A§ 5330 ---------------------------------------- 16

14. Model Penal Code ( U.L.A. ) A§ 2.02 ---------------------- 28

15. Model Penal Code A§ 2.05 -------------------------------- 28

THE HISTORY OF EMBASSY OF ERITREA OPERATION

The Eritrean government has an autonomos right of any financial and any foreign currency exchange prior independence started in 1986 and post independence from 1993 up to the last day of the raid in Eritrean Community Civic Center, located in 600 L Street, Washington, D.C.. The Eritrean government has around 6 officially work in financial service, and these are <u>Central Bank of Eritrea, Housing and Development Bank, Commercial Bank, Red Sea Corporation, Himbol Financial Service, Eritrean Development & Investment Bank and Agaro Bank.</u>

The Eritrean government has a control of all in and out of any currency that transact in the country even through the airport. No one is allowed to carry or to own any foreign currency and if any one was <u>found with even a $ 100, 00 US Currency</u> is punished to tow years of Prison. Therefore, any Eritrean who want to send fund to his family has to go through the party representatives who work prior the independence like <u>the government witness Mr. Tekele worked as a fund raiser, which he adm-</u> <u>itted in the trail of collecting and helping the freedom fighters in</u> <u>buying arms, and later post independence through the Eritrean Embassies</u> <u>around the world. These embassies also make settlement among themselves</u> <u>with out sendoing or transfering the funds through the banks. Therefore,</u> <u>most of the time money deposited in every country embassy of Eritrea</u> <u>kept in the bank account specifically for diplomatic misson account.</u> <u>And fund transfer is ONLY ORDERED BY THE CENTRAL GOVERNMENT TO WHERE</u> <u>THE GOVERNMENT ACCOUNT AROUND THE WORLD OR GOVERNMENT EXPENSES PAYMENT.</u>

The Eritrean embassy duty is among others to <u>collect funds from</u> <u>the Eritrea-American(as in the case of United States) on behalf of the</u> <u>Eritrean Financial Institution, directed and regulated all its transaction</u> <u>and the method of processing the records, such as receipt and payment or</u> <u>transfer with the serial number given from the IRS of Eritrea and send</u> <u>report every quarter, through the embassy pouch and CONTROLED,MANAGED,</u> <u>SUPERVISED AND DIRECTED BY THE EMBASSY ATTACHE AND DIPLOMATS.</u>

The defendant argues that the name listed or stated in the indictment of " HIMBOL FINACIAL SERVICE " , is a fake or fabricated business name in order the prosecuter to easily indict the defendant and able to mislead the grand jury and in the trail jury, knowing the truth and the fact were not told the grand jury and trila jury is very improper and highly questionable that undermine the fair and the integrity of our judicial system where the defendant dreamed and hoped to live and cultivate by the most honored justice, democracy and freedom of the American governemnt and among the most trusted and respected American family value.

Therefore, the history of the " unexisted Himbol Financial Service" company is as follows:

1. the above listed company never existed and operated in US.

2. the operation of the fund or moeny transfer was conducted under the control, management, supervision and direction of the Eritrean embassy.

3. the operation was conducted in both locations, one in 600 L street and one in Eritrean Embassy office. Enay one can send to the Eritrean Embassy and the finacial attache Mr. Tekle will take or send by a driver to be data intered and processed with the Ministry of Finance of Eritrea forms by the employees hired and paid by Embassy.

4. the operation was not either a corporation or solepropriter ship but the Eritrean government owned operation.

5. the  operation conducted by the embassy of Eritrea was receiving checks, credit card, money order, bank wire transfer and cashiers check payable to the EMBASSY OF ERITREA AND PAYMENT AND TRANSFER WERE MADE BY THE EMBASSY OF ERITREA.

6. the bank account was under the EMBASSY OF ERITREA, DIPLOMATIC MISSION ACCOUNT. AND PRIMARY SIGNATORY WAS THE EMBASSY ATTACHE Mr.TEKLE.

7. any changes or additional services or announcement were made by the <u>Central government financial institutions & party leaders.</u>

8. around the beginning year 2000 the defendant was going to Asmara, Eritrea to see his family, worried about the war between Eritrea and Ethiopia, and visited the embassy and found out they need help on developing effective and efficient system of accounting and database. Then the embassy ambassador and the attache gave him a starting project that covers all the database for each of the Eritrean Banks and financial institutions and the embassy was able to print a report for each one of the banks and reconcile with the bank database.

9. after the defendant came back from Eritrea the embassy attache called him and request a new up date on the existed he set up because the <u>CENTRAL GOVERNMENT REQUEST ONE CENTRAL DATABASE UNDER ONE BANK NAME</u> <u>IN ORDER TO MAKE IT EASIER ONE BANK COULD MAKE ALL THE SETTLMENT FOR</u> <u>ALL THE BANKS IN ERITREA. AND ACCORDINGLY THE GOVERNMENT GAVE THE</u> <u>DEFENDANT TO SET UP THE DATABASE UNDER THE PARTY OWNED FINANCIAL</u> <u>INSTITUTION CALLED " Himbol Financial Service " and all other forms</u> <u>and the database of all financial instituion kept as it is. Therefore,</u> <u>instead of making different reporting and multiple name of bank transfer,</u> <u>under one name that is "HIMBOL FINANCIAL SERVICE" all transfer and</u> <u>all reports were processed.</u>

10. while the defendant was working on this project, because of additional bank application work with the Riggs Bank, the bank requested an okey from the Embassy letter that , the defendant was working as a <u>SYSTEM ANALYST AND THE EMBASSY ATTACHE TO THE DEFENDANT AND ADD IN THE</u> <u>BANK ACCOUNT SIGNATURE ACCOUNT CARD.</u> After working and updating the system, due to the war, and the activity of the ambassdort and the attache, the embassy were asking the defendant to print from the embassy computer the embassy transfer form and fill with the order from the CENTRAL BANK IN ERITREA the reqested order and deliver to the bank.

8 - of - 41

After the defendant delivers to the bank manger in diplomatic departme nt, the bank then request the initial of the defendant. The defendant except the above stated statment, delivering and intialing the form, he does not discuss where is the money going or to whom and when with any of the bank employees. The defendant had no responsibility of any additional task of the transfer, finacial statment or transfer order or any balance of the embassy account. The defendant was doing this just to be help full with the situation the country and the people were facing due to the war.

11. after few months the defendant received a call and a letter from the CENTRAL GOVERNMENT that because of the complexity of the work the government requested that the defendant could have work for the government based on commission and the government will provide him access to the ERITREAN-AMERICAN CITIZENS BUT CAN NOT TRANSFER TO ERITRA THROUGH OTHER BANKS IT HAS TO BE THROUGH THE CENTRAL BANK OF ERITREA.

12. after the defendant made a verbal agreement he contacted his law firm BARLEY SNYDER AND ADVISED HIM HE CAN WORK AS A GENRAL CONSULTING AND THEY WILL INCORPORATE A CORPORATION AND START TO OBTAIN THE DISTRIC OF CLUMBIA BANKING LICENSE.

13. the defendant hired an agent Mr. Bishop who later became the confidential Source and government witness. Within around 10 months the defendant recived a license. During this time the defendant had won a contract from eritrean government office, a project funded by the US AID, WORLD BANK, AND AFRICAN DEVELOPMENT BANK THAT RAGE FROM TWO YEAR UP TO 5 YEARS. Therefore, the defendant was going back and forth to Eritrea and come back to check on his embassy project and while he stayed for 2 to 3 month in US he goes back and forth to the embassy and the eritrean comunity civic center.

14. the defendant after he recived the license he gave a copy to the embassy Ambassador and the Central Government, in order to start

9 - of - 41

his project. However, it took over 11 month to respond his request
from the government and then the government request the defendant, to
allow an embassy diplomat to work in his office. The defendant with
out any hesitation he reject the idea and became uncomfortable to cont-
inue his project with the government and terminate his business relation.

15. during all this time the defendant had no agreement to obta-
in any kind license on behalf the embassy operation. He had agreement
to work independently as he was working under his company.

16. the defendant had no authorization to excute any decision,
or never been hired as full time or part time, was not a financial
officer or president, chairman or a party memeber and had no office,
direct phone line, business card or any access to the embassy or any
embassy fiancial records except while he perform in the database, which
is daily activity the employee process and while the employee were
present.

## SUMMARY OF ARGUMENT

The defendant argues that the government indictment is defective and insufficient and should be dismissed becuase it lacks all essential elements of the District Of Columbia, Banking and Financial, Law, 13-140, §§ 10, 28, 47 DCR 3431, Legislative History of law 13-140.

The defendant argues that the indictment was defective becuase it failed to adequately inform the District of Columbia statue because of the 18 U.S.C. A§ 1960 is void for vagueness.

The defendant argues that the A§ 1960 fails to provide clear notice of WHO is required to obtain a license.

The defendant argues that the government failed to establish that the lack of license was Knowingly and Wilful, i.e. that the defendant knew that his lack of license was illegal and that he acted or failed to act intentionally with respect to that fact.

The defendant argues that the court erred sentencing the defendant under the section _____ , as a leader or supervisor when, in fact the defendant was indicted on the statue of 18 U.S.C. A§ 1960, and under the state law or District of Columbia Law, § 26-1023 (a), (b) and (c).. July 18, 2000 D.C Law 13-140 See, note § 26-1001.

The defendant argues that, the government failed to prove that the defendant acted knowing that he had an obligation to register the unlicensed business with the U.S. Treasury and that wilfully failed to do so.

## ARGUMENT

The case of the statue 18 U.S.C. A§ 1960, require to explore the intention and the adoption of the original Version by the congress. In 1992, Congress adopted the original version of 18 U.S.C. A§ 1960, which provide : (a), (b), (1), (A) and (B). In 2001, in the wake of the traumatic events of September 11, of that year, Congress adopted the PARRIOT ACT modifying 18 U.S.C. A§ 1960 as follows:

(a) Whoever knowingly conducts, manages, supervises, directs, or owns all of part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

b) as used in this section :

(1) the term unlicensed money transmitting business" means, money transmitting business which affects interstate or foreign commerce in any manner or degree and;

(A) is operated with out an appropriate money transmitting license in a STATE where such operation is punishable as a misdemeano or a felony under STATE LAW,whether or not the defendant KNEW that operation was required to be licensed or [342 F. Supp. 2d 349 ] that operation was so punishable.

(B) fails to comply with the money transmitting business registration requirement under section § 5330 of Title 31 United States Code, or regulation prescribed.

According the DOJ REPORT July 10, 2004, The USA PATRIOT Act also strengthened the criminal laws against terrorism by making it easier to presecute those responsible for funneling moeny to terrorists. Therefore, section (b) (1) (A) of A§ 1960 refers to acts " punishable as a misdemeanor or a felony" under the law of a given STATE which, in this case implicates the law of the District

12 - of - 41

of Columbia, as it pertains to money transmission business.

The District of Columbia Legislative History of Law 13-140, starts from section 26-1001 up to 26-10   , and for the purpose of this case, will limit to few of the sections.

Section 26-1001, Definitions:

(1) " Applicant"means a person filing an application for a license under this chapter.

(3) " CONTROL " means ownership of, or the power to vote, 25% or more of the out standing voting securities of a licensee controlled by any person.

(4) " CONTROLLING PERSON " means any person in control of a licensee.

(6) " EXECUTIVE OFFICER " means the licensee's president, chairman of the executive committee, senior officer responsible for the licensee's business, chief financial officer, or any other persons who perform similar functions.

(14) " REMIT " means either to :

(a) make direct payment of the funds to the licensee or its representatives authorized to receive these funds, or

(b) deposit the funds in a bank, credit union, saving & loan association, or other similar financial institution in an account specified by the licensee.

Section 26-1002 , License Required:

(a) After the effective date of this chapter [ July 8, 2000] , no person shall engage in the business of money transmission without obtaining a license issued by the Superintendent [Commissioner] under § 26-1009, except as provided in subsection (d) of this section and in § 26-1003.

13 - of - 41

Section § 26-1004 License Qualifications

(a) Each licensee under this chapter shall at all times have a net worth of not less than $ 100,000.00 calculated in accordance with generally accepted accounting principles.

(b) Every corporate applicant, at the time of filing of an application for a license under this chapter and at all times after a license is issued, shall be in good standing in the STATE of incorporation. All non-corporate applicants shall, at the time of the filing of an application for a license under this chapter and at all times after a license is issued, be registered or qualified to do business in the District of Columbia.

Section § 26-1006, License Application :

(a) Each application for a license shall be made in writing, under Oath, and in a form prescribed by the [Superintendent Commissioner ].

(b) For applicant, each application shall contain :-

(1) The exact name of the applicant, the applicant's principal address, the applicant's ficticious or trade name used by the applicant in the conduct of its business, the location of the applicant's business records;

(2) The history of the applicant's material litigation and criminal convictions for the 5 year period to the date of application.

(3) A description of the activities conducted by the applicant and a history of operations

(4) A description of the business activities in which the applicant seeks to be engaged in the District of Columbia

(5) The name , business & residence.

14 - of - 41

The Indictment Reads As Follows :

1. Count One :

Beginning in or around March 2001 until on or about October
25, 2001, in the District of Columbia, the defendant, Kesetbrhan
M. Keleta, did knowingly conduct, control, manage, supervise,
and direct a business, Himbol Financial Service, knowing the
business to an illegal money transmitting business that (i)
affected interstate and foreign commerce and (ii) operated with out
an appropriate money transmitting license in the District of Columbia
, where such operation was punishable as a felony under the law of
the District of Columbia. ( Prohibition of unlicensed Money Transmitting
Business, in violation of Title 18, United States Cod, Section 1960)

2. Count Two :

Begining on or about October 26, 2001, until in or around September
2002, in the District of Columbia, the defendant, Kesetbrhan M.
Keleta, did unlawfully and knowingly conduct, control, manage,
supervise, and direct an unlicensed money transmission business,
Himbol Financial Service, that (i) affected interstate and foreign
commerce; (ii) operated with out an appropriate money transmitting
license in the District of Columbia, where such operation was Punishable
as felony under the law of the District of Columbia; and (iii) failed
to comply with the money transmitting business registration requirments
under Section 5330 of Title 31, United States Code and regulations
prescribed under such section. ( Prohibition of Unlicenced Money
Transmitting Business, in violation of Title 18, United States Code,
section 1960).

Therefore, given all the back ground of the Eritrean government operation and the government indictment, the defendant consulting service and the District of Columbia legislative banking law, the defendant present his arguments as follows.

1. Whether, the defendant had authorization to obtain a license, under the Section § 26-1006,(a),(b)(1)(2)(3)(4)(5)(6)(7)(8)(9), (c)(1) (2)(3)(4)(5)(6)(7)(8),(d)(A)(1)(2)(3)(4) and (e) ?

a. The answer is NO. The embassy of Eritrea has already established the operation, the operation is owned by the government, the operation was controlled, managed, supervised and directed by the attache and the diplomats. According the Section § 26-1006- (b)(1)(2)(3)(4)(5)(6) (7)(8)and (9), D.C LAW 13-140, the defendant had no position as the above DC LAW discribed  and (d) (1)(A)(B)(2)(3)(4) to represent the government of Eritrea  or the embassy of Eritrea.

b. The defendant had NO AGREEMENT AS CONSULTANT TO OBTAIN SPECIFICALLY A LICENSE TO THE EMBASSY OF ERITREA OR THE ERITREAN GOVERNMENT. EVEN WHEN THE DEFENDANT HAD HIS OWN LICENSE THE ERITREAN EMBASSY CONTINUES TO OPERATE OVER 3 YEARS until THE EMBASSY OWNED ERITREAN COMMUNITY CIVIC CENTER WAS RAIDED AND THE 2ND SECRETARY OF THE EMBASSY WAS WORKING IN THE COMMUNITY ADRESSED 600 L ST. and ARRESTED.

C. During the raid books, computers, records and around $ 850,000.00 US Dollar was siezed and the ERITREAN GOVERNMENT AND THE ERITREAN EMBASSY CLAIMED OF THE PROPERTY AND REQUESTED THE UNITED STATES STATE DEPARTMENT. THEREFORE, THE INDICTMENT UNDER UNEXISTED NAME WAS DEFECTIVE AND INSUFFICIENT TO MAKE AS IF THERE WAS A BUSINESS, WHEN INFACT THE OPERATION WAS ERITREAN EMBASSY OWNED,CONTROLED, MANAGED, SUPERVISED AND DIRECTED AND FOR THE ABOVE REASONS THE DEFENDANT HAD NOAUTHORITY TO REPRESENT A GOVERNMENT AND REQUEST ON BEHALF OF GOVERNMENT A LICENSE.

2. Whether , the defendant had any authorization to repres-
ent the operation of the Embassy of Eritrea, and report to Superint-
endent [Commissioner] for any operation realted activity. According
§26-1011 , Special reporting requirments, § 26-1011, (1)(2)(3)(4),
even if there is a criminal conviction or bankruptcy of a licensee,
the Commission is required to seek the information from the Key
Shareholders, or Directors. This simplifies the meaning of the
positions are key of the operation and there is no such as manager,
controller, supervisor or some one who direct it. And according the
D.C LAW, it also define that " if the is affecting or it expected
impact the license, to report the Commission. Thus, the defendant
had no role or authorization that create any impact to the operation,
because the operation owns and operated by attache and diplomats.

3. Whether the defendant had any authorization, to represent
the Eritrean government or Eritrean Embassy, or EVEN IF THERE WAS
A COMPANY AND HAD A LICENSE, ACCORDING § 26-1012 ,(3) If there is
a change of the company, in order to obtain an aproval, aperson
shall, deliver such other information to the Superintendent
[Commissioner] as the Superintendent [Commissioner] may require
concerning the financial responsibility, background, experience,
and activities of the applicant, its directors, officers, principals,
and members, and of any proposed new directors, officers, principals
and members of the licensee.

Therefore, the section § 26-1012, does not mention any one
who works, consults as a system analyst, or a manager, supervisor,
control in the corporation operation, but as in this Eritrean Embassy
or Eritrean government ownership and controlled by the attache or
diplomat, the D.C. LAW Section § 26-1012 does not apply and thus the
defendant can not be responsible and indited of the crime the embassy
acted.

17 - of - 41

4. Whether, the defendant had any authorization to keep records of the business or the operation of the Eritrean Embassy, according Section § 26-1014, (a)(1)(2)(3)(4)(5)(6)(7)(8), and (b) (c). The answer is <u>NO.</u> First of all the operation in this case is established for years by the party memebers of the Eritrean-American citizens and for any information about their relationship with customers is confiden cial and is kept <u>ONLY UNDER THE CONTROL OF THE ATTACHE AND DIPLOMATS.</u> <u>During the set up process, the defendant had difficulties to reveal</u> <u>the real process the embassy was conducting about its information.</u> <u>The defendant was give, documents crossed it account number, names,</u> <u>amounts and total amounts and dates. The defendant also told to the</u> <u>ICE AGENTS who were investigating the operation in year 2002, while</u> <u>they intervewing him.</u> Therefore, if the defendant had no access to embassy office, to any bank statement, can not discuss with any one about the operation of Eritrean Embassy because he doe not represent and has no office or a table for his own to work while he was working in the projects, does not have any key access to the office and has to work under supervision of the diplomat or the employee when he is even in the Eritrean Community Civic Center.

5. Whether, the defendant is responsible to receive any an <u>ADMINISTRATIVE CEASE AND DESIST, PROCEEDING IF THE SUPERINTENDENT</u> <u>[commissioner] determines that a licensee or aPerson Required to</u> <u>HAVE A LICENSE UNDER THIS CHAPTER OR AN AUTHORIZED DELEGATE HAS</u> <u>VIOLATED, IS VIOLATING OR IS ABOUT TO VIOLATE ANY PROVISON OF THIS</u> <u>OR ANY RULE,REGULATION OR ORDER IMPOSED BY THE SUPERINTENDENT</u> <u>[COMMISSIONER] OR WRITTEN AGREEMENT ENTERED INTO WITH THE SUPERINT-</u> <u>ENDENT [COMMISSIONER] PURSUANT TO THIS CHAPTER.</u>

Section §26-1022 (b) (1) describes as <u>ACEASE AND DESIST,</u> PROCEEDING, shall be <u>INITIATED BY THE ISSUANCE OF A NOTICE OF</u> <u>CHARGES WHICH SHALL CONTAIN A STATMENT OF FACTS DESCRIBING THE</u> <u>ALLEGED VIOLATIONS.</u>

Section §26-1022 (b) (2) describes as the notice of charges shall  set a date, time, place at which a hearing will be held to determine whether a CEASE AND DESIST ORDER SHOULD BE  ISSUED AGAINST A"LICENSEE"OR"PERSON REQUIRED TO HAVE A LICENSE".

Section § 26-1022 (c) describes as A CEASE AND DESIST ORDER MAY REQUIRE THE PERSON LICENSED, OR REQUIRED TO BE LICENSED, OR AN AUTHORIZED DELEGATE TO CEASE AND DESIST THE VIOLATION.

Section § 26-1022 (d) describes as the Superintendent [ Commissioner ] MAY ISSUE AND SERVE UPON THE LICENSEE OR PERSON REQUIRED TO BE LICENSED.

(1) THE LICENSEE OR PERSON OR AUTHORIZED DELEGATE AGREES TO SETTLE , THE PROCEEDING BY CONSENTING TO THE ORDER AS NEGOTIATED BY THE SUPERINTENDENT [COMMISSIONER, PRIOR TO THE COMMENCEMENT OF THE HEARING.

(2) THE LICENSEE OR PERSON OR AUTHORIZED DELEGATE SERVED WITH THE NOTICE OF CHARGES FAILS TO APPEAR AT THE HEARING, IN WHICH CASE THE LICENSEE OR PERSON OR AUTHORIZED DELEGATE SHALL BE DEEMED TO HAVE CONSENTED TO THE ORDER AS ISSUED.

(3) Substantial evidence in the hearing record supports the determination  of the Superintendent [Commissioner] thet the violation or violations specified in the notice of charges has transpired.

Section §26-1022 (e) describes as A FINAL CEASE AND DESIST ORDER SHALL BECOME EFFECTIVE 10 DAYS AFTER THE SERVICE OF THE ORDER IN ACCORDANCE WITH SUBSECTION (d) of this Section,EXCEPT THAT A FINAL CEASE AND DESIST ORDER WHICH HAS BEEN ISSUED UPON CONSENT SHALL BECOME EFFECTIVE UPON THE DATE SPECIFIED IN THE ORDER.

A FINAL CEASE AND DESIST ORDER SHALL REMAIN IN EFFECT UNTIL
IT IS STAYED, MODIFIED, TERMINATED, OR SET ASIDE BY THE
" SUPERINTENDENT [ COMMISSIONER ] OR A REVIEWING COURT. THEREFORE,
THE DEFENDANT, BASED ON THE ABOVE DC LAW and ENFORCEMENT FOR A
VIOLATION OF ANY CRIME OR OFFENSE THE EMBASSY OPERATION IS NOT
RESPONSIBLE AND EVEN IF THERE WAS ANY CORPORATION OR SOLEPROPRITER
MUST HAVE THE OPPORTUNITY OF DUE PROCESS OF THE LAW IN ORDER TO BE
MAINTAIN THE INTEGRITY OF OUR JUDICIAL SYSTEM. THUS THE INDICTMENT
IS DEFECTIVE AND FLAWED AND SHOULD BE DISMISSED ON ITS INTIERITY.

The defendant argues that A§ 1960, fails to provide clear
noitice of "WHO IS REQUIRED TO OBTAIN A LICENSE " . The court HELD,
See, UNITED STATES V. FARHAD TALEBNEJAD, 342 Supp. 2d 346; 2004
U.S. Dist. LEXIS 21659, Criminal No. PJM 03-0517, by its terms, they
argue, 18 U.S.C. A§ 1960 punishes anyone who " knowingly conducts,
controls, manages, supervises, directs or owns all or part of
unlicensed money transmitting business" § 18 U.S.C A§ 1960. In contrast
, A§ 26 - 1001 up to A§ 26 - 102 , of the finacial institutions
Article of the District of Columbia Code, the licensing requirment
incorporated in to §1960, does not indicate who is required to obtain
the state license. Instead, A§ 26-1002, merely provides " no person
may engage with out obtaining the license issued by the Superintendent
[ Commissioner ] under § 26-1009, except as provided in subsection (d)
of this section and in § 26-1003.

Therefore, as consequence, any number of individuals affiliated
with unlicensed money transmitting business could be punished under
§ 1960 despite the fact they may not be required to obtain license
under A§ 26-1002, § 26-1009 and A§ 26-1009 or otherwise make certain
that a license has been obtained.

The court, once again, held and stated " in so far as the Government means United States, bases its prosecution on 18 U.S.C. A§1960 (b)(1)(A), the Court finds that the lack of license must be punishable under MARYLAND law  before it may be punished federally. Accordingly, only those persons who are punishable under Maryland law can commit or be charged with a federal crime. To the extent that the federal statue seeks to punish a more expansive catagory of individuals, the Court deems it inoperative.

The Court asekd [ 342 F.Supp.2d 360 ] Who, then does Maryland punish for unlicensed activity ? . The Government concedes that Maryland law " requires that the business be licensed and does not require designation of a particular person to obtain the license ". (Emphasis added ). Indeed, as related ancedottaly by defense counsel at oral argument, it appears that in 1995 the Maryland State Bank Commissioner sent a notice relative to licensing to the resident agent of one of the corporations alleged to have violated 18 U.S.C A§ 1960 in this case. It is clear that, in addition to corporation, an individual doing business as a sole proprietor would also be prosecutable under MARYLAND LAW. The question is whether an individual officer, shareholder or mere employee of corporation could be indivi dually charged.

The short answer is that, under certain circumstances, a corporate officer through whose act or failure to act a corporation commits an offense agianst STATE LAW  may well be found guilty of the same offense. Fletcher Cyclopedia fo the LAW of Private Corpo- rations  states the general principles:

" The existence of the corporate entity does not shield from Prosecution the corporate agent who knowingly and intentionaly causes the corporation to commit a crime. The corporation obviously acts, and can act, only by and through its human agents, and it is their

which the criminal law must deter, and those actors who in fact are
culpable. Since a corporation is an individual existing only in
contemplation of the law, its criminal acts are those of its officers
and agents; and thus persons in control of a corporation and who
knowingly acquiesce to the corporation illegal conduct may be personally
prosecuted for the criminal act. Where the violation alleged is of a
passive nature, such as failure to comply with a statue or regulation,
generally the prosecution must prove that the officer had the responsib-
ility and authority to ensure compliance.

A number of federal cases are illustrative. See e.g. <u>United
States V. Park, 421 U.S 658, 673, 44 L.Ed. 2d 489, 95 S. Ct. 1903
(1975)</u> ( in presecution for interstate shipment of adultrated food,
president of corporation could not be held responsible solely on
the basis of position in corporation; to be guilty jury had to find
" by virtue of his position....[he]had... authority and responsibility
to deal with the situation" ); <u>United States V. Jorgensen, 144 F. 3d
550, 560 (8th Cir. 1998)</u> ( Corporate officer who had intend to defraud
and either personaly participated in misbranding of meat or was in
" responsible realtionship" to misbranding by company could be held
criminally responsible); <u>United States V. Amrep Corporation , 560
F. 2d 539, 545 (2d Cir 1977)</u> ,(in mailfraud/interstate lan sales
fraud prosecution, corporate officers who were active and knowing
participants in illict scheme would be equally liable under corporation),
<u>United States V. Schlei, 122 F.3d 944, 971 (11thCir. 1997)</u>(in conspiracy/
securities fraud prosecution, corporate officers who wifully participated
in the scheme could be held criminally responsible); <u>United States V.
Kyle, 257 F. 2d 559, 563 (2d Cir 1958)</u> (in prosecution for mail fraud
secretary-treasurer of corporation could be individually responsible or
liable for criminal activity of corporation, " whether he be called
a mailing consultant or an officer and director who was a knowing

22 - of - 41

and active participant in the corporation operations" of the swindle; but CF. Fede V. The Videotrip Corporation, 697 F. Supp, 1165, 1177 ( D. Colo. 1988) ( claim for copyright infiringement may be brought against officer or stockholder who is responsible for corporation's infringing activities).

[ 342 F. Supp. 2d 361] As corollary of these cases, it must be said that to the extent that an officer, director, shareholder or employee had no responsibility with regard to the corporate act whose commission or omission comprises the criminal act and to the extent that that person did not knowingly act or omit to act, there can be no criminal liability on the part of that individual. Which brings us back to the present case. The Court finds that under the Meryland law the only individuals who would conceivably be "punishable" under Maryland law for a corporation's failure to obtain money transmission business license would be the individual or individuals, presumably but not necessarily officers, who had responsibility to apply for a license and who knowingly and wilfully failed to do so.

The Court expand the statement by saying " if the Governement chooses to re-charge a  Defendant individually in the present case under 18 U.S.C. A§ 1960 (b)(1)(A), it must allege and prove as to such Defendant  that he had such responsibility and/or authority to secure a money transmission license business and that he knowingly and wilfully failed to do so.

On the other hand, the Court again distinguishes prosecutin brought under 18 U.S.C. A§ 1960(b)(1)(B), the registration provison, and A§(b)(1)(A), the licensing provision. Because prosecutions under A§ (b)(1)(B) do not depend upon whether the business is licensed

under Maryland law, 31 U.S.C. A§ 5330(a)(1), the catagory of who

is punishable under the law is expansive as the federal statue posits,

i.e., " whoever knoingly conducts, controls, manages, supervises,

directs, or owns all or part of an unlicensed money transmitting

business." 18 U.S.C. A§ 1960(a).

 The Court finds no consitutional vagueness in this clause.

The only caveat is that anyone charged under this provision would

to be shown to be acted knowingly and wilfully.

 In the case of this Embassy of Eritrea operation, the defendant

even though the operation structure is unlike the corporation and

sole proprietor, it seems that it is his consititutional right to

argue that the 18 U.S.C. A§ 1960 violates Due Process because it

lacks a scienter requirment.  As in the case of Maryland law the

Government counters that the statue in fact contains a scienter

requirment since under A§ (b)(1)(A) the Government must show that

the defendant knew he was unlicensed, although it need not show that

he knew that the lack of license was illegal.

 The Court again went further to explain, that the problem,

however, is that the clause preceding that clause still refers to

the operation of such a business " where such operation is puishable

as a misdemeaner or felony under the State Law. There is no doubt

that Congress attempted to exclude any MEAN REA  requirment when it

amended A§ (b)(1)(A). A violation occurs " whether or not the

defendant knew that the operation was required to be licensed or

that the operation was punishable".

 Bearing in mind that criminal  statue must be strictly

construde, See, e.g., United States [ 342 F. Supp. 2d 354 ]  V.

Lanier, 520 U.S. 259, 266, 137, L. ED. 2d 432, 117 S. Ct. 1219 (1997),

the  plain meaning of these words is that unless the lack of license

is " punishable " under STATE LAW, it is not federal crime at all.

See, Velastegui, 199 F. 3d at 593 ("we must look at or to [STATE]
law to determine whether Defendant were operating an illegal money
transmitting business" ). Indesputable, if state has no law punishing
an unlicensed money transmitting business, there is no violation of
the federal law. The Court sees no meaningful distinction between
states which impose no punishment at all and those which only punish
" knowing " and " wilful " violations of ther licensing law.

Therefore, MARYLAND is such a state. Its law expressly provides
that " knowing and wilful " violation of its money transmission
licenseing requirment is punishable as a felony. MD Code Ann., Fin.
Inst. A§ 12-430 (2003 repl. Vol.). Accordingly the District of Columbia
Financial Inst. Code A§ 26-11

The Court went on to explore the meaning of the words and asked
" What do these words mean? ". A 1995 case from the Maryland Court of
Special Appeals dispels all doubt. In Reisch V. State of Maryland,
107 MD. App. 464, 668 A.2d 970 (1995), the defendant was convicted
in the trail Court of violating Maryland's home improvement licensing
law, in part beacuse he was unlicensed. The Court of Special Appeals
reversed the conviction, rejecting " any claim that the terms of
knowingly and wilfully [in the statue] are mere surplusage  or that
the home improvement  provisons in issue impose strict criminal
liability." 668 A.2d at 975.

Severla of the Court's observations bear noting:

Strict liability criminal offenses that do not require
mens rea were generally enacted in response " to the demands of
public health and welfare arising from the complexities of society
after the Industrial Revolution. Typically misdemeanors involving
only fines or other light penalities, these strict liability laws
regulate food, milk,liquor,medicines and drugs, securities, motor
vehicles and traffic, the labeling of goods for sale, and the like".

25 - of - 41

Gamett, 332 Md. 571, 578, 632, A.2d 797 (1993). See also Dawkins,
313 Md. 638, 644-645, 547 A.2d 1041 (1988). But, as the Court of
Appeals has acknowledged, " the contemporary view...disfavors strict
liability offenses. " Dawkins, 313 Md. at 650, 547 A.2d 1041. See,
also Gamett, 332 Md. at 579, 632 A.2d 797( " Modern scholars generally
reject the concept of strict criminal liability"); State V. McCallm,
321 Md. 451, 456, 583 A.2d 250 (1991).

     The Court also stated that, although the statue here has
characteristics  that are regulatory in nature, see, e.g., Dawkins
313 Md. at 644, 547 A.2d 1041; McCallum, 321 Md. at 456, 583 A.2d 250;
Hary Berenter, Inc V. Berman, 258 md. 290, 294, 265 A.2d 759, it is
also punitive. Indeed, a maximum period of incarceration of two years
is not a " light " penalty, and this factor militates against
characterizing the statue as a strict liability " public welfare
offense. " McCallum, 321 Md. at 457, 583, A.2d 250. When, as here,
" the statue is both remdial and panel, the remedial portion may be
construed liberally while the panel provisions must be strictly
construed in favor of the accused and against the State".

     The Court then stated,that surely, appellant knew that he
did not possess a home improvement license. But the question is
whether appellant's failure to obtain a home improvement license
compels a finding of a knowing and wilful failure to obtain a license,
in violation of A§A§ 267 and 268.

     For offenses prohibiting the failure to act, such as failure
to obtain a license, the term " wilful " is " commonly interpreted"
[ 342 F. Supp. 2.d 355] as an intentional or deliberate failure.
See Hoey V. State, 311 Md. 473, 492, 536 A.2d 622(1988); Brown V.
State, 285 Md. 469, 474-75, 403 A.2d 788 (1979). Similarly, the
term " wilful " has been used to characterize an act done with
" delibrate intention ". Cover V. Taliaferro, 142 Md. 586, 596,

122 A.2d ( 1923) ( cited with approval in, Shell V State, 307 Md. 46, 66, 512 A.2d 358 ( 1986). See also  IN RE TAKA C., 331 Md. 80, 84, 626 A.2d 366 (1993) ( delibrate intent requires more than the intent to do the act which leads to the harm; it requires that the defendant actually intended to cause the harm); Resenberg V. State, 164 Md. 473, 476, 165 A. 306 (1993). ( Emphasis in original). 668 A.2d at 976-79.

The Court went on to say that because the state could not prove that the defendant deliberately intended not to secure a home improvement license, his conviction was flawed.

By a parity of reasoning, the Court finds that the terms " knowingly and wilfully " are not mere surplusage in Maryland's money transmission statue. Unless each of the elements of the offense are alleged and proved beyond a reasonable doubt, the lack of a license simply is not"punishable"in this State. And if the lack of a license is not punishable in Marland, it is not punishable under 18 U.S.C. A§ 1960.

As for the second clause of A§ 1960(b)(1)(A), where Congress has attempted to extinguish the MENS REA  requirment, at least two conclusions are possible. Either the clause is hopelessly in conflict with the preceding clause's reference to acts "punishable.... under State law " or it is merely inoperative in States such as Maryland where the "knowing and wilful " requirment for punishment has been clearly established. The Court recognizes that the second clause  of A§ (b)(1)(A) may still have application in states that have not yet had occasion to determine whether their licensing statue have a MENS REA requirement. Accordingly, the Court accepts this latter hypothesis is the more plausible and finds no need to sever or strike the second clause.

Returning to the central point, however; To the extent that any prosecution under 18 U.S.C A§ 1960 may go forward on the basis of a Defendant's lack of a Maryland license, the Government must establish that the lack of license was knowing and wilful, i.e., the defendant knew that his lack of license was illegal and that he acted or failed to act intentionally with respect to that fact.

The Court went on, to say that this does not exhaust consideration of the MENS REA requirment in the federal statue. The Government has alleged an alternate basis to establish that Defendants violated 18 U.S.C A§ 1960, VIZ., that under A§(b)(1)(B) they failed to comply with the money transmission registration requirments under 31 U.S.C. A§ 5330. Section (b)(1)(B), of course contains no reference to scienter one way or another, but it is immediately apparent that Congress made no effort to amend that clause in 2001 it amended A§ (b)(1)(A) to exclude a scienter requirement. On the other hand, liability under 31 U.S.C. A§ 5330 may be established " whether or not the business is licensed as a moeny transmitting basis in any State, 31 U.S.C A§ 5330 (a)(1).

Accordingly, the Court's [ 342 F. Supp. 2d 356 ] thrshold inquiry of whether the offense is "punishable" under Maryland law has no application and the Court is obliged to confront the constitutional issue head-on.

The Courtalso, finds that 31 U.S.C. A§ 5330 by implication also incorporates a MENS REA requirments, i.e., it must be shown that a Defendant knew he was required to register his money transmission business with the U.S. Treasury and that he intentionally failed to do so. The Court arrives at this conclusion based not only Congress's failure to amend 18 U.S.C. A§ (b)(1)(B) when it amended A§ (b) (1) (A). The conventional understanding is that

28 of 5

MENS REA is a fundamental component of every criminal act. See
Morissette V. United States, 342 U.S. 246 , 250, 96 L. ED. 288,
72 S. Ct. 240 (1952). See also Model Penal Code (U.L.A) A§ 2.02.
At a minimum, DUE Process surely requires that any effort to enact
a strict liability criminal statue be clearly expressed, See,
Morissette, 342 U.S. at 263, Model Penal Code, A§ 2.05, particularly
where the crime in question is not obviously one involving the
public welfare, Morissette, 342 U.S. at 255-56, or public morality,
and where the potential punishement and fine are considerably more
than minimal in amount, Morissette, 342 U.S. at 256, in the case
incarceration for up to five years and fines established not only
by Title 18 of the U.S. Code, but also by 31 U.S.C. A§ 5330, as well
as possible forfeitures in the millions of dollars.

The court concluded by saying in sum, to the extent that the
Government may choose to re-indict a Defendant under 18 U.S.C
A§ 1960 based on the Defendant's failure to comply with the
registration requirement s, it will have to allege and prove  that
the Defendant acted knowing that he had an obligation to register
and that he wilfully failed to do so.

6. Whether the defendant had an authorization to register
the Embassy of Eritrea or the Eritrean Government operation, with
the secretary of Treasury not later than the end of the 180 - day
period begining on the later of. According the 31 U.S.C. A§ 5330,
registration of money transmitting businee.

The defendant argues that in addition to the above court
decision in the Maryland State case, under the D.C LAW :

(A) Registration with Secretary of the Treasury required :

(1) In general : Any person who OWNS or CONTROLS a  money
transmitting business shall register the business ( whether or not
the business is licensed as a money transmitting business in any STATE),
with the Secretary of the Treasury not later than the end of the
29 - of - 41

·180 - day.

(B) Contents of Registration :- the registration of a money transmitting business under Subsection (a) shall include the following informations:-

    (1) The name and Location of the business

    (2) The name & address of each person who

    (a) OWNS or CONTROLS the business

    (b) Is a Director or Officer of the business

    (c) Other wise Participates in the Same

(c) Civil Penalty  :- the civil penalty to comply for FAILURE to comply with registration requirments.

    (1) In general : Any PERSON WHO FAILS TO COMPLY  with any requirments of this section or any regulation prescribed under this section shall be liable to the United States for a Civil Penalty of $ 5,000.000 for each such violation.

Therefore, the defendant according teh above stated requirements and the D.C. law ruls and regulation, the defendant had no OWNERSHIP OR CONTROL, as described in , A§ 26 - 1001 (3) " CONTROL", means ownership of or the power to vote, 25%, or more of the outstanding voting securities of a licensee controlled by any person. And the above subsection does not state any one who controls, manages, direct or supervise as it stated in the indictment.

The defendant also argues that the government, intentionaly included the FELONY ISSUE OR VIOLATION WITH A CIVIL PENALTY IN THE SECOND COUNT OF THE INDICTMENT  AND THAT INCLUSION COULD BE A FRUIT FOR DISASTER AND THERE IS NO QUESTION THAT WILL MISLEAD THE GRAND JURY AND THE TRIAL JURY AND MADE THIER DECISION WOULD BE , ON THE BASIS OF THE  " FELONY " wording on both COUNTS , when in fact the SECOND COUNT was a CIVIL PENALITY undert the  31 U.S.C A§ 5330 (e) CIVIL PENALITY FOR FAILURE TO COMPLY TO REGISTER OR WITH REGISTRATION REQUIRMENTS .

The defendant argues that the Prosecutor Knowingly and intentionally, tried to seperate the operation of the Eritrean embassy that was set up for years by the party memebers and party representatives, and operated under the Eritrean Community Civic Center by the authority and responsibility of the Eritrean embassy attaches and diplomats and ambassador :-

a) by not disclosing the whole activity to the grand jury

b) by not explaining the D.C. Banking Law and rules and regulations and the incorporation of the federal law

c) by not seperating the counts in a felony and civil penalty

d) by distorting the facts and the true fact of the evidencce of the operation, and to make it as if there was an independant business managed privately or corporate way, hiding the operation from public in the Eritrean Community

e) by fabricating and designing the unexisted business in the name of "Himbol Financail Servuice " when in fact , the same name was among of other Eritrean Banks and financial institutions in the data base of the Eritrean Embassy computers and Eritrean Community computers and records

f) while the evidence  gathered and investigated over three years and was cleary and materially shows the Embassy operation

The general business principle of structureing and operating a corporation or a Sole propritership has to have at least the following elements :

1) there has to be an entity who provide goods and services

2) there has to a permit  for  Ocupation

3) there has to be a bank account under the service provider

4) there has to be a decision making authority and responsible

5) there has to be organizational structure of excutive officer that ahs authority of hireing, negotiating with partners, give inst-

31 - of - 41

ruction, reprsenting the company or private as a sole proprietor, and to take responsibility to protect the public from any fraud, scheme, and provide a guaranty of quality and sfae product and services honestly and legaly

6) payment should be made to the service provider

7) clintel and business communication is made through the service provider

8) business expense should be made by the service provider

9) all business utility such as phone, internet, credit card, bank to bank transfer, fax,and bank checks should be under the service provider name

10) business profits and tax payments are recorder under the service provider name

11) any servie provider, servicing its clintel over 20 years period , would be recognaized by the name and could be recalled as a trade mark and customers would keep that trust for long time, as in the case of The Eritrean Embassy and Eritrean Government.

Therefore, considering the above stated statments and the evidence gathered from the banks and 600 L street, the Eritrean Community, it is obvious that the OWNERSHIP AND A COMPLETE CONTROL OF THE ERITREAN EMBASSY , AS THE HONORABLE JUDGE COLLEEN KOTTELLY stated it was in deed A GOVERNMENT BUSINESS AND THE GOVERNMENT HAD THIER OWN NAME AND SIGNATURE ON THIER EMBASSY OPERATION. And the government of Eritrea was provideing its own citizens for more than 20 years of this trusted money transfer, that started during the independence era in 1986, as the Embassy attache Mr. Tekel testified in the trial.

The defendant also want to explore the testimony given by the embassy employee Tsegreda Leake during the grand jury to clarify the issue specifically to the Court of appeals.

The testimony of the embassy employee was as follows :-

On Page 5, Line 2. Q. Were there ever occasions when you would accept more than $ 500.00 ?

Line 4. A. Sometimes , like one a month......

Line 7. A. I would ask Fessahaie, Mr. Tekel mean the embassy attache

Line 9. Q. He was not physically there, is that what you testified
         last week ?

Line 13-14. A. Fessahaie is at the embassy, but though the telephone

Line 22-25. A. I would ask him if he would need the cash at the
                 embassy & if not I do not accept any cash over $500.00

Page 22, Line 7. Q When Mr. Keleta was running the business, would he be there essentially all day long from when the business opened until when it closed.?

Line 10. A. NO.

Line 15. A. But,he would come like around 4:00 O'clock or 5:00 O'clock
             about , it was when the business closed. He does not
             stay there from NINE TO FIVE .

Page 23, Line 13. Q. Did you ever know whether or not the business
                 needed a license ?

Line 15. A. I know, I was considered part of the embassy, so I do
             not think about it.

Page 25. Line 17. Q. Are you familiar with the business in Eritrea
                 called " Himbol Financial Service." ?

Line 19. A. Yes , I , I know. in Eritrea there is one.

Line 15. A. Yes, we had recieved an investment broucher about this.

Page 27.and Page 28. the entire page explains not only Himbol Financial Service but also the rest of the Eritrean Banks and financial ins titutions such as Housing and Commercial were under the same embassy operation and the smae as Himbol clintel were sending and opeñning

33 - of - 41

opening an account to deposit money the same way they send through
the embassy of Eritrea, and processed under the same database the
defendant set up.

Page 33. Line 6. Q. Who did you first tell that you have received
                    the subpoena ?

Line 8. A. You mean to any body ?

Line 9. Q. Yeah, who is the first person you told that you ...

Line 12. A. Fessahaie, which is the embassy of eritrea attache,
                who hire Tsegreda Leake as an employee of empbassy
                and interviewd her in the embassy office before she
                started the job.

        Therefore, according the testimony, the Embassy of Eritrea
was in charge for any activity that take place and as we see the
employee testimony, even as low as $ 500,00 dollars to accept or
not, the embassy have to know first for any request and make a
decsion. The same with any transfer or refund no one is allowed
to have access with out the permition and instruction to do it.
Accordingly the defendant was told to sign and drop off the form
of the embassy transfer of diplomatic mission account in the bank.

        Furthermore, the defendant in addition to the above testimony,
would like to elaborate based the District of Columbia Banking and
Financial Institution legislative law.

        The defendant argues that , the trial counsel never spoke
or showed him that there was a District of Columbia banking law. The
defendant was only knew that there was Federal Case because of the
transfer of money out side the country and never had this knowledge
at all until he was incarcerated.

Therefore, the defendant contends, that the operation of the embassy of Eritrea WAS OWNED AND CONTROLLED, by the government of Eritrea based the evidence, that started in 1986 preindependence and after the independence from 1993 up to the date of the raid. The Eritrean-American citizen , churches, universities, non profit organization were sending to thier families and to their development project respectively. And the payment was always made payable to Embassy of Eritrea.

And the Eritrean Embassy on behalf of the Eritrean Banks and Financial institutions receive the fund and deposit in its diplomatic account and transfer when ever the central government needs to use the fund.  All  American  FDIC memebers were the one who service the embassy operation needs, such as HSBC BANK, CITI BANK, RIGGS BANK and so on.

The defendant as per his law firm and counsel advise, he provided a consulting service in information managment system. The defendant was not full or part time employee and he has his own corporation that provide service in Africa for projects funded by the World Bank, African Development Bank and US AID.

The defendant never acted deliberatly, intentionally , knowingly, and willfuly, to violate any type of the United States whether Federaly, State or County law. The defendant is a law-abiding citizen, and when ever he conduct business he always seeks a prof-essional and legal advice, as he did in the case of the Embassy.

The defendant, understanding the situation our nation is experiencing after 911, he was more than happy to help the agents of ICE , Homeland Security Department, to understand the operation of the Eritrean embassy and the Eritrean Government with out a fear of his life , because he had no hidden agenda or secret agreement with any one and his a man of truth and integrity.

35 - of - 41

The defendant had an agreement with the Eritrean Governemnt to provide service because of the complexity of the financial and database processing and reporting system, independently to provide the service if he obtain his own license. The defendant based on his counsel advice, he hired an agent and he obtained a license from the D.C Banking. However, because the Eritrean Government controll the operation he could not start his operation because he was not willing to break law to please the embassy requests.

The defendant also , knowingly, wilfully, intentionally never engaged in the business of money transmission with out a license, as per A§ 26 - 1023 (c).

The defendant also argues that, under Section A§ 26 - 1024, Promulgation Rule, the Superintendent [ Commissioner ] is authorized to Promulgate RULES AND REGULATIONS to implement this Chapter. And , during the trial the Assistant Commissioner , testified that, this kind of violation is not punishable because the new law is not known by many and we first give a warrning or a notice to come and comply with the registration, as per Section A§ 26 - 1022 (b)(1).

The defendant also argues that, under Section A§ 26 - 1025, CONSENT OF JURISDICTION, any licensee,authorized delegate, or other person who knowingly engages in business activities that are regulated under this chapter with or without filing an application, is deemed to have consent to the jurisdiction of the courts of District of Columbia for all actions arising under this Chapter.

Finally , the D.C legislative law concludes its chapter of the above and through out the argument stated Sections of the D.C law, that the reference in this Section to the Superintendent of Banking and Financial Institution, is deemed to be a reference to the COMMISSIONER of the DEPARTMENT OF INSURANCE, SECURITIES AND BANKING, SEE A§ 26 - 551 - 03.

36 - of - 41

In Conclusion, the defendant argues that, is the violation was punishable, under the States Law and then, there should not be an indictment or should not be punishable with out the provideing the opportunity of the District of Columbia LAW,Section A§ 26-551-03 and specifically for the money transmitting business,Sections from A§ 26-1001 up to Section A§ 26-1025.

According the Special Court of Appeal, in the case of <u>U.S. v. Talebenjad</u> , the Court stated " Beasring <u>in mind, that criminal statue must be strictly construed, See, e.g., United [ 342 Supp. 2d 354 ] State V Lanier, 520 U.S. 259, 266, 137, L. ED. 2d 432, 117 S.Ct. 1219 ( 1997). The plain meaning of these words is that unless the lack of a license is " PUNISHABLE " under state law, it is NOT A FEDERAL CRIME AT ALL. See, Velasteguis 199 F.3d at 593 ( " We must look to [ STATE ] to determine whether defendants were operating an illegal moeny transmitting business " ). Indisputably, if the state has no law punishing un licensed money transmission business, there is no violation of the federal law.</u>

According the D.C Banking & FINN. Law A§ 26-1022 & A§ 26-1023 the law expressly provides that <u>" knowing  and  wilful "</u> violation of its money transmission licensing requirment is punishable as a felony. And the governemnt did not prove that the defendant " knowingly and wilfully " violated the D.C. LAW A§ 26-1022.

Therefore, based the Maryland States special Court of Appeals, and the District of Columbia Banking and Financail, legislative law A§ 26-551-03 and that the defendant right of Due process and his conistitutional rights being violated, and after the verdict, the <u>U.S. Attorney, Kennth L. Wainstein and</u> made a remark as the defendant was operating <u>under the radar of D.C. government knowing " HIS BUSINESS " lacks a M.T.license and transfered millions to overseas to places</u>

such as Libya , Africa and other place, and such business transfer
funds to terrorists and found guilty and will be senetence to over
10 years but will be serve around 5 and half  to 6 and half year
in prison. The defendant was completely shocked and was in disbleif.
As the result of the news, news paper and internet , the defendant
new business recived phone calles from clintel and was told he is
not well come to service them and they do not want to assaciate
with his business. The defendant and his wife's repetetion was
ruined and finacial lenders and mortgage comapny refused to provide
service. The defendant and his family with two doughters are in a
crucial stage of thier life after being in United States for over
13 years with out any trouble with the law, excelled in education
start to live him and his wife long dream to have a family and
a wonderful living standard like any American Citizen was shatered
by un true statement of the United States Attorney Mr.Wainstein.


    WHEREFORE, THE DEFENDANT REQUEST THE HONORABLE JUDGES AND
THE COURT OF APPEALS, TO GRANT  HIS REQUEST, WITH OUT PREJUDICE
THE INDICTMENT BE DISMISSED AND REVERSE THE VERDICT, FOR THE REASON
STATED IN THE ABOVE AND THE EVIDENCE AND THE DEFENDANT INNOCENCE.


                Respectfully, Submitted,


                KESETBRHAN M. KELETA

                    PRO SE

## CONCLUSION

For, the foregoing reasons, the appellant, Kesetebrhan M. Keleta, respectfully request that his sentence be vacated and the matter dismissed.

### REQUEST FOR ORAL ARGUMENT

Because of the significance of the issues presented in this appeal, Mr. Keleta, respectfully requests that Oral Argument be granted in this case.

Respectfully, Submitted,

_____
Kesetbrahn M. Keleta

PRO SE

This __4__ day of, <u>September</u> 2007.

IN THE

<u>UNITED STATES COURT OF APPEALS</u>

DISTRICT OF COLUMBIA CIRCUIT

CASE NO. 07 - 3021

UNITED STATES OF AMERICA

APPELLE

V.

KESETBRHAN M. KELETA

APPELLANT

Certificate of Service of The Brief

In accordance with the <u>RULE 25</u> of the Federal Rules of Appellant Procedure, I hereby certify that I have this <u>4</u> day of <u>September, 2005,</u> mailed postage prepaid the <u>1 ( one)</u> copy of the Supplement of the Brief and the office of the Clerk, Special Deputy of Counsel, Mrs. Nancy G. Dunn, Mr. Roy Wallace Mcleese III, Assistant U.S. Attorney, 555 4th street, NW. room 10-449 Washington, DC. 20530, by placing in the mail afix postage.

KESETBRHAN M. KELETA

PRO SE

40 - of - 41

 



100 East Market Street    P.O. Box 15012    York, PA 17405-7012    Tel (717) 846-8888    Fax (717) 843-8492

Attorneys at Law
www.barley.com

CRAIG T. TREBILCOCK, ESQUIRE
Direct Dial Number: (717) 852-4988
E-mail: ctrebilcock@barley.com

York      Lancaster   Harrisburg
Reading   Hanover     Chambersburg

July 20, 2001

*via Federal Express and*
*Facsimile Transmission (202) 829-7289*

Mr. Kass Keleta
3210 Chestnut Street NW
Washington, DC 20015

Dear Mr. Keleta:

I am writing in regard to your request that our office investigate and evaluate potential business commitments with Direct Merchants Bank. We are working on this issue. However, in the interim, please let me advise you that you should have no direct business involvement in the international transfer of funds. You currently have an application pending to accomplish this purpose through registration with the government of the District of Columbia. While it is permissible for you to do general consulting, you may not directly accept accounts, customers or funds. To do so would put your proposed business enterprise in jeopardy and perhaps subject you to civil/criminal penalties.

Thank you for your consideration of my views on this matter.

Sincerely,

Craig T. Trebilcock

CTT:CS:1000079.1



**Exhibit 2**

**ATTORNEYS AT LAW**

100 East Market Street
P.O. Box 15012
York, PA 17405-7012
Tel 717.846.8888  Fax 717.843.8492
www.barley.com

**Craig T. Trebilcock, Esquire**
Direct Dial Number: 717.852.4988
E-mail: ctrebilcock@barley.com

May 12, 2005

Mr. Kesetebrhan Keleta
1201 South Queen Street
York, PA  17403

Dear Mr. Keleta:

I am writing to provide you with an update of the grand jury proceedings and investigation relating to suspected improper funds transfers by the Eritrean Community Center in Washington, DC.

As you may recall, you had received an invitation from the U.S. Attorney's Office to come testify before the grand jury pertaining to whether you had any knowledge of improper dealings through that entity. My legal advice to you was not to appear at this time, as the invitation noted that you might be deemed a subject of the investigation. Although there is no apparent truth to that allegation, under our system, it is in your best interests at this point to protect your legal rights by remaining silent on the matter.

There is no indication to date that the Department of Justice and/or Department of Homeland Security have concluded their investigation into this matter. Accordingly, your immigration status continues to remain held in limbo by the government until this issue is resolved. The Government is apparently holding the processing of your adjustment of status application in abeyance until this is resolved. Accordingly, please be advised of two important issues.

First, you are still legally present in the United States due to your pending adjustment of status application. However, in view of the investigation and grand jury proceedings, you should not attempt to travel outside of the United States until this matter is resolved. Further, your travel permit (advance parole) has not been approved by the U.S. Government and likely will not be approved until the investigation is concluded.

Second, please be aware that any attempt on your part to travel at this point could potentially be deemed by the Attorney General and the Department of Homeland Security as an illegal attempt to depart the United States to avoid the investigation. Although you have not been identified as a suspect in the above-referenced investigation, by attempting to invite you before the grand jury and notifying you that you may be deemed a potential target of the investigation, it is possible that the Attorney General could take the position that an attempt to depart the United States at this point was improperly motivated in order to avoid or thwart U.S. judicial proceedings.



May 12, 2005
Page 2

        Accordingly, please be advised that it is my legal recommendation that you continue to remain in the United States and to not travel outside of our borders until and unless we are able to determine that the Department of Justice has terminated all proceedings to which you are currently designated as a witness/potential target.

                              Sincerely,

                              Craig T. Trebilcock

CTT:cs:1396429.1

Sworn and subscribed to
before me this 12th day
of May, 2005.

Elizabeth M. Ensig
Notary Public

My Commission Expires:

Notarial Seal
Elizabeth M. Einsig, Notary Public
City of York, York County
My Commission Expires Sept. 19, 2005
Member, Pennsylvania Association of Notaries

Exhibit 3.



DAILY RECORD / SUNDAY NEWS — JASON PLOTKIN

George Stantzos of West Manchester Township takes in an espresso at Sequina Cafe in Village Green Shopping Center on East Market Street in Springettsbury Township.

# Tranquility of Africa

**■ Scents of coffee, culture comfortably mingle at Sequina Cafe.**

**By TERESA McMINN**
*For the Daily Record/Sunday News*

The story of Kass Keleta's life so far reads like an award-winning movie script.

As a young boy in Africa in the mid-'60s to late '70s, he and his family enjoyed short summer car rides to visit his grandparents on a coffee bean plantation where it was common to see wild giraffes, tigers, camels and hyenas roaming nearby.

He has fond memories of his family roasting fresh coffee beans in a pan and grinding them with a mortar and pestle hand-made from a small tree.

They boiled the brew and poured it through a filter made of woven horse-tail hair into a clay pot.

His parents worked at a military base in Eritrea off the Red Sea, and made friends with American soldiers. They often invited the Americans to their home and enjoyed social events such as ballroom dancing on Fridays.

Keleta learned English at an early age, often played with the military kids, and watched television shows aired on a special channel for the Americans. He is a fan of "Bonanza" and "Dragnet," and movies including "Cleopatra" with Elizabeth Taylor and cowboy films.

The Americans also introduced him to Jimi Hendrix, Nat King Cole, Woodstock, James Brown and Frank Sinatra. Keleta's early album collection included Johnny Cash and Elvis Presley.

"It was a fun childhood. What I remember is the honesty, caring . . . integrity that Americans will not lie and the family responsibility," he said. "I always wanted to come to the U.S."

His early experiences contributed to his appreciation of music, art and culture, which today he shares over coffee with customers at his new Sequina Cafe in Village Green Shopping Center on East Market Street. The restaurant features live music Friday and Saturday evenings and showcases work from local artists.

Keleta, 43, has degrees in macroeconomics, international finance and technology. He is a system designer and has worked all over the world.

He speaks Greek, Japanese, Italian;



DAILY RECORD / SUNDAY NEWS — JASON PLOTKIN

Art reflects Eritrean and East African culture at Sequina Café.



**Eritrea, Africa**

Sequina Café owner Kass Keleta grew up in the East African nation of Eritrea.

DAILY RECORD / TRACEY CULLEN

Amharic, the language of Ethiopia; and Tirgrina, the language of Eritrea.

He and his wife, Hermon Mussie-Keleta, an electrical engineer, have been in the York area for the last two years.

They also own a system-design business on South Queen Street that keeps his wife busy with worldwide travel.

The couple opened Sequina — which means tranquility and is named after their 2-year-old daughter — so Kass could have a York-based job and be close to the toddler and her sister, Amilimebri, who is three months old.

The new eatery offers all-natural, fresh, healthy foods and a large variety of coffees that are roasted daily on premises. Keleta uses fresh coffee

beans from Africa, beans that are still moist with natural oils that give the brew a creamy texture, he said.

He also has fresh tea from Africa. Coffees vary in potency from a robust brew to a milder coffee bean from Sumatra, and a sweeter Tanzanian peaberry bean.

Sequina also serves freshly roasted low-fat meats, baked breads and pastries made from scratch with no preservatives. The chef uses olive oil instead of butter, and healthy ingredients such as sesame seeds, yogurts and ginger for homemade salad dressings, Keleta said.

On Saturdays, Sequina also features international cuisine that includes dishes with fava beans, hummus, and African-style rice curry with chicken. Kass does not use ingredients with caramel, syrup or processed sugar.

Sequina also has wireless Internet access, offers catering and makes European-style birthday cakes to order. The cafe has a carryout menu that includes more than a dozen hot and cold sandwiches, salads, soups, breakfasts and hot and cold beverages.

Keleta is in the process of creating a more elaborate dine-in menu that will include several European-style meals, such as roast beef with pasta, quiche, goat meat with rice and lasagna.

"It's very different, not only organic but without any chemicals or color," Keleta said about meals at his cafe. "We will not use any bottled dressing or canned product whatsoever."

Kelly Blessing works across the street and said she will be a regular lunch customer at Sequina. She recommends the ham and Swiss cheese panini with everything.

"I love it . . . It's something healthy," she said recently on her lunch break. "It has cucumbers and sprouts. It's absolutely wonderful."

## IF YOU GO

Sequina Cafe hours are 7 a.m. to 5 p.m. Monday; 7 a.m. to 7 p.m. Tuesday through Thursday; 7 a.m. to 8 p.m. Friday and Saturday; 10 a.m. to 5 p.m. Sunday.

International foods are featured Sunday and live music is available Friday and Saturday evenings. Place fax orders at 505-8654.

Artists can call Kass Keleta at 505-8630 for more information.

Exhibit 4.

# Chase ends in crash

**By BRENT BURKEY**
*Daily Record/Sunday News*

A short police chase in York early Wednesday morning led to a four-car crash, and the man police allege ran from them was charged with driving under the influence.

No injuries were reported.

Police allege 32-year-old Gregory Sexton of York fled an attempted traffic stop by a Pennsylvania State Police trooper before crashing into three parked cars in the 200 block of West Hope Avenue.

According to a state police news release, the trooper first saw a dark-colored Acura speeding on West College Avenue, then saw the car go through red lights at South Beaver Street and South Pershing Avenue.

He activated his lights and sirens, police said, but the driver kept going.

The car first turned south onto Oak Lane, then turned right onto West Hope Avenue, where the driver crashed into three parked cars, police said.

Sexton was charged with driving under the influence, possession of cocaine and marijuana, possession with the intent to deliver drugs, fleeing and eluding police, driving with a suspended license and failing to stop at two red lights.

# Alternati

■ **They must charge $8 per day or less, the c school district requested.**

**By JEFFREY B. ROTH**
*For the Daily Record/Sunday News*

York City School District is se alternative-education providers will charge $85 per day or less, a trict committee learned Wedne night.

Interim Assistant Supt. Deb Mieczkowski told the educational grams and general policy comm that letters were sent to alternativ

# Local man guilty in money wiring

■ **Kesetbrhan Keleta illegally sent millions to overseas customers, federal officials said.**

**By MICHELE CANTY**
*Daily Record/Sunday News*

A Springettsbury Township man accused of illegally wiring more than $8.3 million to overseas customers was found guilty of operating an illegal money-transmitting business, federal officials said.

A federal jury in Washington, D.C., found Kesetbrhan M. Keleta, 43, guilty of the charges June 29, according to a news release from U.S. Immigration and Customs Enforcement.

Keleta has a sentencing hearing Oct. 4 in federal court. He faces a maximum sentence of 10 years in prison, but the likely range is 5¼ to 6½ years, the news release indicates.

He could not be reached for comment Wednesday.

Federal investigators said Keleta ran a money-transmitting business, Himbol Financial Services, at the Eritrean Cultural and Civic Center in Washington, D.C., in 2001 and 2002.

Customers used the business to send money primarily to Eritrea, but also to other places in East Africa and the Middle East,

"The defendant operated his money-transmitting business below the radar of the D.C. and federal regulators," said U.S. Attorney Kenneth L. Wainstein in a statement. "In this post-9/11 era, it is critical that we shut down unlicensed money transmitting businesses so that they cannot be used by criminals and others who seek to harm our nation."

Federal law makes it illegal to manage, supervise, control or direct a money transferring business that is not licensed by a state or the District of Columbia and that is not registered with the U.S. Department of Treasury.

Keleta did not have a license, was not registered and operated his business despite knowing of the requirements, federal officials said.

In 2001 and 2002, authorities said Keleta was responsible for wiring more than $8.3 million to overseas customers.

Federal officials said they've cracked down on these types of businesses because they pose a threat to homeland security because they can be tapped to send money anywhere in the



BIG BROTHERS BIG SISTERS

Make A BIG Difference

Saturday, July 15, 2006
11 AM to 3 PM

Join Boscov's as we help raise funds and awareness for Big Brothers Big Sisters of York.

Boscov's
York Galleria

EXHIBIT S

## Â§ 26-1022. Enforcement.

(a)Â  The Superintendent [Commissioner] may institute an administrative cease and desist proceeding if the Superintendent [Commissioner] determines that a licensee or person required to have a license under this chapter or an authorized delegate has violated, is violating, or is about to violate any provision of this chapter or any rule, regulation or order imposed by the Superintendent [Commissioner], or written agreement entered into with the Superintendent [Commissioner] pursuant to this chapter.Â

(b) (1)Â  A cease and desist proceeding shall be initiated by the issuance of a notice of charges which shall contain a statement of facts describing the alleged violations.Â

(2) The notice of charges shall set a date, time, and place at which a hearing will be held to determine whether a cease and desist order should be issued against a licensee or person required to have a license. The hearing date shall be no earlier than 30 days and no later than 60 days, after the date of service of the notice, unless otherwise prescribed by the Superintendent [Commissioner] or the hearing officer.Â

(c)Â  A cease and desist order may require the person licensed, or required to be licensed, or authorized delegate to cease and desist the violation.Â

(d)Â  The Superintendent [Commissioner] may issue and serve upon the licensee, or person required to be licensed, or authorized delegate a final cease and desist order if:Â

(1) The licensee or person or authorized delegate agrees to settle the proceeding by consenting to the order as negotiated by the Superintendent [Commissioner], prior to the commencement of the hearing:Â

(2) The licensee or person or authorized delegate served with the notice of charges fails to appear at the hearing, in which case the licensee or person or authorized delegate shall be deemed to have consented to the order as issued; orÂ

(3) Substantial evidence in the hearing record supports the determination of the Superintendent [Commissioner] that the violation or violations specified in the notice of charges has transpired.Â

(e)Â  A final cease and desist order shall become effective 10 days after the service of the order in accordance with subsection (d) of this section, except that a final cease and desist order which has been issued upon consent shall become effective upon the date specified in the order. A final cease and desist order shall remain in effect until it is stayed, modified, terminated, or set aside by the Superintendent [Commissioner] or a reviewing court.Â

(July 18, 2000, D.C. Law 13-140, Â§ 23, 47 DCR 3431.)

**Legislative history of Law 13-140.** See note to Â§ 26-1001.Â

**Editor's notes.** The reference in this section to the Superintendent of the Office of Banking and Financial Institutions, is deemed to be a reference to the Commissioner of the Department of Insurance, Securities, and Banking. See Â§ 26-551.03.Â

Prev Doc      Next Doc

Â§ 26-1023. Criminal penalties.

(a)Â  Any person who knowingly and willfully violates any provision of this chapter for which a penalty is not specifically provided shall be guilty of a misdemeanor and, on conviction thereof, shall be fined not more than $5,000, or imprisoned for more than 1 year, or both.Â

(b)Â  Any person who knowingly and willfully makes a material, false statement in any document filed or required to be filed under this chapter with the intent to deceive the recipient of the document shall be guilty of a felony and, on conviction thereof, shall be fined not more than $10,000, or imprisoned for not more than 3 years, or both.Â

(c)Â  Any person who engages in the business of money transmission without a license as provided herein shall be guilty of a felony and, on conviction thereof, shall be fined not more than $25,000, or imprisoned for not more than 5 years, or both.Â

(July 18, 2000, D.C. Law 13-140, Â§ 24, 47 DCR 3431.)

**Legislative history of Law 13-140.** See note to

ExHIBIT 7

**§ 26-1024. Promulgation of rules.**

The Superintendent [Commissioner] is authorized to promulgate rules and regulations to implement this chapter.

(July 18, 2000, D.C. Law 13-140, § 25, 47 DCR 3431.)

**Legislative history of Law 13-140.** See note to § 26-1001.

**Editor's notes.** The reference in this section to the Superintendent of the Office of Banking and Financial Institutions, is deemed to be a reference to the Commissioner of the Department of Insurance, Securities, and Banking. See § 26-551.03.


Prev Doc    Next Doc