UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, )<br> )<br>    Plaintiff-Appellee; )<br> )   Crim. No. 05-371 (CKK)<br>    v. )   (Appeal No. 07-3021)<br> )<br>KESETBRHAN KELETA )<br> )<br>    Defendant-Appellant. )<br> ) | |

**DEFENDANT KESETBRHAN KELETA'S SUPPLEMENT TO HIS MOTION
FOR RELEASE PENDING APPEAL AND
<u>INCORPORATED MEMORANDUM OF AUTHORITIES IN SUPPORT THEREOF</u>**

Defendant Kesetbrhan Keleta, through undersigned counsel, hereby supplements his previously filed Motion for Release pursuant to 18 U.S.C. § 3141(b) and § 3143(b).

Mr. Keleta is currently incarcerated at FCI Elkton, having served nearly 10 months of a 31-month sentence. This supplemental request for release is based on his claim on appeal that the sentencing guidelines considered in determining his sentence were improperly calculated, such that his correct guideline range should have been 0-6 months. This Court need not resolve the merits of this claim in order to release Mr. Keleta pending his appeal. This Court need only find that his legal claim to a guideline range of 0-6 months raises a "substantial question of law," which it clearly does.

Under § 3143(b)(1), therefore, Kesetbrhan Keleta is entitled to have his "detention terminated at the expiration of the likely reduced sentence." Here, even if he were to receive the top of

the 0-6 month range, he will have already completed that sentence.

## Procedural History

On October 6, 2005, a grand jury returned an indictment charging Kesetbrhan Keleta with two counts of operating an illegal money transmitting business in violation of 18 U.S.C. § 1960. Mr. Keleta was arraigned on November 2, 2006. During that hearing, this Court placed Mr. Keleta on bond on his own recognizance.

Trial commenced before this Court on June 26, 2006 with jury selection. On June 29, 2006, the jury returned guilty verdicts as to both counts in the indictment. After the verdict, this Court continued Mr. Keleta on the same release status of his own recognizance.

In the PSR, the probation office calculated Mr. Keleta's offense level as 26, based on a base offense level of 6 under U.S.S.G. § 2S1.3(a)(2), plus 20 levels under § 2B1.1 because the offense involved the transfer of more than $7,000,000. Mr. Keleta submitted objections to this enhancement.

The Court rejected Mr. Keleta's argument that the base offense level of six should not be enhanced by twenty levels because no loss or potential loss existed in this case. The Court also dismissed what it referred to as the "safe harbor" provision of section 2S1.3(b)(3) of the Guidelines which would have reduced Mr. Keleta's offense level to six and provided a guideline range of zero to six months. The Court specifically

ruled this provision inapplicable to Mr. Keleta because it found that he acted with reckless disregard of the source of the funds. 1/26/07 Tr. 84. In so ruling, the court stated to Mr. Keleta:

> Now in the context of this offense, there is a safe harbor, and that's 2S1.3(b)(3), which provides a basis to reduce the offense levels back to level 6 where you could be sentenced for probation.
>
> The defendant hasn't raised this, but the government did, and I've gone and looked at it. The safe harbor requires four criteria to be met. Three of those criteria, based on the evidence that I have, the defendant really can't meet.
> The three criteria are the defendant didn't act with reckless disregard of the source of the funds, which really I think goes to the issue of knowledge.
> Funds were proceeds of lawful activity and funds to be used for lawful purpose. This could be a situation where somebody registered with the Treasury but not with the state, or some other instance.
> There's no evidence that Himbol had controls in place, no way to verify the nature or source of the funds transferred. Some of these requests were made by mail. The staff had no training in terms of compliance programs or something that would have flagged, if appropriate, that there was suspicious activity. And the programs, as I've indicated a couple of times, the Treasury requires really to assist the business to be able to do it.
> The transfers, there was no control system, so I certainly would view it as a reckless disregard of the source of the funds.
> The defendant has argued that the funds from the Eritreans in the United States go to poor families in Eritrea. I'm sure that that's true to some extent. I don't know how much because, frankly, we don't have any information, so we don't know who received them, for the purpose. We don't have any evidence one way or the other. So it lacks affirmative evidence other than I'm sure, as a practical matter, that that occurred to some degree based on the information that the court has.
> Defense counsel cited to a company that -- or a licence to transmit. They have controls in place. If you transfer over a certain amount, immediately you have to report it. There's a whole series of things.
> And as I indicated, I've had cases where they've used Western Union or whatever and they've actually been able to track the funds. They have been illegal drug things and various others. So this actually works

>     if you have the controls in place.  So I think this
>     offense has a built-in downward departure which the
>     defendant can't qualify for.

Id. at 83-84.

Subsequently during the sentencing hearing, the Court ruled Mr. Keleta had demonstrated that he accepted responsibility for failing to secure a license for the money transfer business that was the subject of the indictment against him.  1/26/07 Tr. 87.  For this reason the Court reduced the total offense level by three points.

The Court also found that Mr. Keleta's crime did not squarely comport with the conduct identified in the applicable sentencing guideline.  1/26/07 Tr. 88.  Specifically, Mr. Keleta began in the money transfer business under a belief that the owner of the business- the Eritrean Embassy- could and would protect the employees of the business, including Mr. Keleta.  Id. at 89.  For this reason, the Court further reduced Mr. Keleta's offense level by two points, thus resulting in a total offense level of 21 and a sentencing guideline range of 37 to 46 months imprisonment.  Id. at 90.

Lastly, the Court determined that as a deportable alien, Mr. Keleta was entitled to downward departure from the sentencing guidelines of six months.  Id.  The Court imposed a sentence of 31 months imprisonment on each count of conviction to run concurrently, followed by two years of supervised release, and a special assessment of $200.00.  Id. at 91.  A timely notice of appeal was filed on February 2, 2007.

After the sentencing, the government did not contest Mr. Keleta's request for voluntary self-surrender, and the Court allowed him to remain free on the existing release conditions pending his self-reporting to a facility to be designated by BOP. On March 29, 2007, he reported as ordered to CI Moshannon Valley, where he remains today, having served nearly ten months in prison.

### Grounds for Release Pending Appeal

Under 18 U.S.C. § 3143(b)(1), a court shall order release pending appeal if it finds (emphasis added):

> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released . . . ; and
> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in --
>
> (i) reversal,
>
> (ii) an order for a new trial,
>
> (iii) a sentence that does not include a term of imprisonment, or
>
> (iv) <u>a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process</u>.

In the last circumstance, "the judicial officer shall order the detention terminated at the expiration of the likely reduced sentence." § 3143(b)(1).

Because the appeal is not for purposes of delay and Kesetbrhan Keleta presents no issue of dangerousness or potential

flight,[1] the only question is whether his appeal raises a "substantial question of law" within the meaning of § 3143(b). A "substantial question" is "'a close question or one that very well could be decided the other way.'" United States v. Perholtz, 836 F.2d 554, 555 (D.C. Cir. 1987) (per curiam) (quoting United States v. Bayko, 774 F.2d 516, 523 (1st Cir. 1985)). This standard does not require that the Court find that it is likely to be reversed before it may grant release pending appeal. See Bayko, 774 F.2d at 522-23. Rather, the Court is to "evaluate the difficulty of the question" on appeal, United States v. Shoffner, 791 F.2d 586, 589 (7th Cir. 1986), and grant release pending appeal if it determines that the question is a close one that very well be decided in the defendant's favor.

Mr. Keleta intends to challenge on appeal the Court's finding that the "safe-harbor" provision of United States Sentencing Guideline §2S1.3(b)(3) is not applicable to him. That provision reads:

> (b) Specific Offense Characteristics. . .
>     (3) If (A) subsection (a)(2) applies and subsections (b)(1) and (b)(2) do not apply; (B) the defendant did not act with reckless disregard of the source of the funds; (C) the funds were the proceeds of lawful activity; and (D) the funds were to be used for a lawful purpose, decrease the offense level to 6.

---

[1] This Court having concluded after the guilty verdict that Kesetbrhan Keleta was unlikely to flee since he was facing only about 3 years in jail, and Kesetbrhan Keleta having self-reported to serve a 31-month sentence, there is no likelihood he would flee now that he has 21 months left to serve even if his original sentence is ultimately affirmed.

As the government conceded in its sentencing memorandum, Mr. Keleta satisfies the first prong of subsection (b)(3). See Government's Sentencing Memorandum at 6, n. 2.  The second prong of subsection (b)(3) requires proof that the defendant did not act with reckless disregard of the source of the funds.  This Circuit has defined reckless disregard as a subjective standard requiring proof of actual awareness by an actor of the likely consequences of his actions, and permitting an inference of that state of mind from circumstances in which the actor departs in an extreme fashion from standards of ordinary care.  Saba v. Compaignie Nationale Air France, 78 F.3d 664, 669 (D.C. Cir. 1996).  The government has argued, and the Court accepted, that Mr. Keleta failed to satisfy that he was not reckless because the money transfer business (Himbol Financial Services) he was convicted of managing had no controls in place to ensure that the transferred money was derived from legal sources.  On the contrary, the trial record demonstrates that Himbol Financial Services operated with controls, and certainly not in an extreme fashion outside standards of ordinary care.

Specifically, Tsigerada Gebru testified that customers wishing to transfer funds had to complete a money transfer form. 6/27/06 Tr. 304.  The form contained information about the sender, the recipient, and included a phone number or bank account number for the latter.  Id. at 307.  Mr. Keleta designed computer software to track the senders, their addresses, their telephone numbers, and other information. 6/28/07 Tr. 432.  Also,

individuals could not send more than $500 without special authorization from an official of the Embassy of Eritrea or Mr. Keleta. 6/27/06 Tr. 308, 330. Moreover, all funds to be transferred were deposited in the Riggs Bank account of the Embassy of Eritrea, which presumably had all of the controls the government claims Himbol Financial Services lacked. Id. at 365. The funds were subsequently transferred to an Eritrean Bank from Riggs Bank. Id. at 405. Lastly, all of the government exhibits documenting the amounts of money Himbol accepted for transfer were maintained at 600 L Street, NW, and the Court admitted them as reliable business records memorializing information about senders and receivers of funds. Id. at 313, 315. At a minimum, the trial testimony raises the inference that the system of recording money transfers first established by the Embassy of Eritrea, and subsequently managed by Mr. Keleta, had the hallmarks of a system that did not recklessly disregard standards of ordinary care in tracking the transfer of funds.

With regard to the last two prongs of § 2S1.3(b)(3), the record provides both evidence that the money transferred was not intended for an unlawful purpose and that it was intended for a lawful purpose. As the trial testimony made clear, Mr. Keleta did not establish the money transfer business involved in this case. 6/28/06 Tr. 422. Rather, in 1993 it was established by, and operated through the Embassy of Eritrea. Id.; 6/27/06 Tr. 381. As recounted by witnesses during the trial, the funds being transferred were from Eritreans living in the United States to

provide money to people back in Eritrea. 6/27/06 Tr. 303. Fessahaie Tekle, an Embassy administrator, intimated that money was sent to Eritrea to help people there suffering from food shortages and drought. 6/28/06 Tr. 420.  There was no allegation that the funds were from an illegal source whatsoever or were to be used for illegal activity.  Indeed, the government noted in its closing, "I want to make clear up front, that the government is not alleging in this case that the money here was dirty, that it was connected with drugs, or with fraud, or had terrorist connections. We are not saying that." 6/29/06 Tr. at 659-60.

Contrary to the logical inferences raised by trial testimony, and in the face of evidence to the contrary, the Court, determined that Mr. Keleta recklessly disregarded the source of the funds transferred through Himbol Financial Services or transferred money from unlawful sources for use in unlawful endeavors. Mr. Keleta does not at this time challenge his conviction.  He only seeks a reduction to his sentence given the mitigating circumstances inherent in his particular crime.

To the extent that counsel for Mr. Keleta failed to affirmatively present evidence in support of application of the safe harbor provision of § 2S1.3(b)(3), counsel's performance was deficient and prejudiced Mr. Keleta.  This will be one of many reasons, Mr. Keleta intends to challenge the effectiveness of his trial counsel on appeal.

For these reasons, Kesetbrhan Keleta has a legitimate basis

under which to challenge the sentencing guideline range the Court determined applied to his case. This Court need not resolve the issues Mr. Keleta raises in this motion in order to release Mr. Keleta pending his appeal. This Court need only find that his legal claim to a guideline range of 0-6 months is a "substantial" one that could be decided in his favor.

Undersigned counsel has explained to Mr. Keleta that, if he is released pending appeal and then ultimately loses his appeal, he will have to return to prison to serve the remainder of his 31-month sentence. Understanding that risk, he has informed counsel that he wishes to be released pending appeal.

WHEREFORE, defendant Kesetbrhan Keleta respectfully requests that this Court grant this motion and issue the attached proposed Order requiring his release.

>Respectfully submitted,
>
>A.J. KRAMER
>FEDERAL PUBLIC DEFENDER
>
>
>_____/s/_____
>Tony Axam, Jr.
>Assistant Federal Public Defender
>625 Indiana Avenue, N.W., Suite 550
>Washington, D.C.  20004
>(202)  208-7500

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff-Appellee;<br><br>v.<br><br>KESETBRHAN KELETA<br><br>    Defendant-Appellant. | Crim. No. 05-371 (CKK)<br>(Appeal No. 07-3021) |

### ORDER

Upon consideration of defendant's Motion for Release Pending Appeal and Supplement thereto, it is hereby:

ORDERED that defendant's motion is GRANTED; and it is further

ORDERED that the Defendant shall be released from custody pending appeal in this matter.

SO ORDERED this _____ day of _____, 2008.


_____
COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE