IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 05-371-01 (CKK)** |
| | : | |
| v. | : | |
| | : | |
| **KESETBRHAN M. KELETA,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S SUPPLEMENT
TO HIS MOTION FOR RELEASE PENDING APPEAL**

Defendant, Kesetbrhan Keleta, has filed a supplement to his motion for release pending appeal. He contends that the new appeal issue that he intends to raise – that the Court erred in declining to apply the "safe harbor" provision in § 2S1.3 – will result in his having to serve "a sentence that does not include a term of imprisonment" or "a reduced sentence" 18 U.S.C. § 3143(b)(3)(iii), (iv). However, as with the matters he discussed in his original motion, Keleta continues to be unable to demonstrate that his appeal of the new issue "raises a substantial question of law or fact likely to result" in the relief he desires. See 18 U.S.C. § 3143(b)(3).

First, as Keleta concedes, he did not seek to have the Court apply the "safe harbor" provision of § 2S1.3. See Supplement at 9. Nor did he object when the Court concluded that the "safe harbor" was inapplicable. Accordingly, Keleta has waived this issue, and, on appeal, it will be subject to plain error review.[1] As the government demonstrated in its opposition to Keleta's

---

[1] Keleta asserts that his trial counsel's failure to request the Court to apply the "safe harbor" provision amounted to ineffective assistance and that he intends to press the ineffective assistance claim on appeal. However, "[w]hen a defendant has not previously raised such a claim [of ineffective assistance] before the district court, [the court of appeals' general practice] is to remand it for an evidentiary hearing." United States v. Weathers, 186 F.3d 948, 958 (D.C. Cir. 1999). That certainly will happen here. In any event, under Strickland v. Washington, 466

original motion for release pending appeal, an appeal that is subject to plain error review almost by definition fails to present a substantial question.  See Government Opposition at 6, n.8, citing United States v. Geddings, 497 F. Supp.2d 729, 737 (E.D. N.C. 2007) and United States v. Pulley, 730 F. Supp. 55, 59 (W.D. Ky. 1990).

Even if the Court assumes that Keleta adequately preserved the question of the applicability of the "safe harbor," his appeal on that ground would fail.  The evidence was overwhelming that Keleta did not qualify for t he decrease in his offense level under the "safe harbor."

For a defendant to gain the benefit of a sentencing reduction under § 2S1.3(b)(3), he must satisfy four conditions.  First, subsection 2S1.3(a)(2) must apply to the case, and the enhancements in subsections 2S1.3(b)(1) and (b)(2) must not apply.  In addition, a defendant must show that he "(B) . . . did not act with reckless disregard of the source of the funds; (C) the funds were the proceeds of lawful activity; and (D) the funds were to be used for a lawful purpose . . . ."  See § 2S1.3(b)(3).  If these criteria are met, then a court is to "decrease the offense level to **6**." Id.

At the outset, it is important to note, as Keleta ignores, that it is the defendant who has burden of proof in establishing his entitlement to an offense level reduction pursuant to the "safe harbor."  See  United States v. Aissatou Pita Barry, Cr. No. 05-210 (RMU), Memorandum Order dated December 15, 2005, attached as Exhibit 1.  See also United States v. Abdi, 342 F.3d 313,

---

U.S. 668, 687 (1984), "the defendant must show that the deficient performance prejudiced the defense." Weathers, 186 F.3d at 958.  As demonstrated below, the record amply supported the Court's conclusion that the "safe harbor" did not apply to Keleta, and any failure on the part of his counsel to press the issue did not prejudice him.

317 (4th Cir. 2003), cert. denied , 540 U.S. 1167 (2004), ("[T]he defendant, not the government, has this burden of showing entitlement to any *reduction* [under the § 2S1.3 'safe harbor']."). Even if he had tried to do so, Keleta could not have satisfied the criteria set forth in § 2S1.3(b)(3).

The government conceded in its original sentencing memorandum that this matter satisfied the first prong of the "safe harbor" test – that is, subsection (a)(2) applied and subsections (b)(1) and (b)(2) did not apply. However, Keleta also would have had to demonstrate that he "did not act with reckless disregard of the source of the funds." § 2S1.3(b)(3)(B). Keleta could never have met this burden. Himbol had no controls in place to verify that the funds being transferred were clean. Indeed, the testimony at trial was that much of the money the business received simply came in the mail. All the sender needed to demonstrate was that the recipient overseas had a phone number or a bank account. No one at Himbol ever inquired as to the source of the funds that the business was handling. Nor did the staff receive any training on how to detect suspicious transactions.[2] Significantly, the Department of the Treasury regulations that govern the operations of a money transmitting business such as Himbol require the operation to have certain controls in place. In particular, under 31 C.F.R. § 103.125,

---

[2] Keleta seems to make much in his supplemental pleading of the fact that Himbol maintained voluminous records of the financial transactions in which the business engaged. See Supplement at 7-9. However, all those records showed was who the purported senders were and who the purported recipients were. They gave no clue as to the real source of the funds or their true destination. Keleta also believes that Himbol's use of an Eritrean Embassy account at the former Riggs Bank can give the Court comfort about the presence of controls over the funds that Himbol transferred. Id. at 8. However, the Riggs Bank embassy banking program was fraught with irregularities. See, e.g., "Riggs Bank Agrees to Guilty Plea and Fine," The Washington Post (January 28, 2005) ("The fine . . . will bring to $41 million the total civil and criminal penalties paid by the 160-year-old bank to resolve anti-money laundering deficiencies in its former embassy and international programs."), attached as Exhibit 2.

money transmitters are required to develop and implement an Anti-Money Laundering ("AML") compliance program. Each AML compliance program must be in writing and must:

    i.    incorporate policies, procedures and internal controls reasonably designed to assure compliance with the Bank Secrecy Act ("BSA"), 31 U.S.C. § 5312 *et seq.*;

    ii.    designate a compliance officer responsible for day-to-day compliance with the BSA and the compliance program;

    iii.    provide education and/or training of appropriate personnel; and

    iv.    provide for independent review to monitor and maintain an adequate program.

Keleta and Himbol instituted none of the protections that the regulations require.

Keleta further would have had to establish that the "the funds were the proceeds of lawful activity." § 2S1.3(b)(3)(C). Keleta would have failed to satisfy this requirement because, as discussed in the previous paragraph, he had no controls in place to ensure that the money Himbol was transmitting was the proceeds of legal activities.

Last, a defendant must be able to show that "the funds were to be used for a lawful purpose." § 2S1.3(b)(3)(D). Again, because of the absence of controls, Keleta and Himbol had no idea for what purpose the recipients of the funds would use the money. In any event, the government presented evidence that some of the wire transfers were separate unlawful acts, wholly apart from being violations of 18 U.S.C. § 1960. As set forth in Government Exhibit 14, approximately $12,020 in wire transfers went to Libya during 2001 and 2002 while Keleta was running Himbol. These wire transfers violated the U.S. government's ban on financial transactions with Libya that was in effect at that time. See 31 C.F.R. § 550.202. Those transactions thus further disqualified Keleta from being able to take advantage of the "safe harbor."

Keleta candidly includes in his supplemental pleading the portion of the sentencing hearing during which the Court concluded that the "safe harbor" was inapplicable and made detailed factual findings in support of that conclusion.[3]  See Supplement at 3-4.  The Court's findings were amply supported in the record and were not clearly erroneous.  Keleta's planned appeal of the "safe harbor" issue does not raise a substantial issue of law that is likely going to result in a reduced sentence or a sentence of no imprisonment.

## Conclusion

For the foregoing reasons, the Court should deny Keleta's motion for release pending appeal.

        Respectfully submitted,

        JEFFREY A. TAYLOR
        UNITED STATES ATTORNEY
        D.C. Bar No. 498610

By:            /s/
        Jay I. Bratt
        Assistant United States Attorney
        Illinois Bar No. 6187361
        National Security Section
        Room 11-437
        555 Fourth Street, NW
        Washington, D.C.  20530
        (202) 353-3602
        Jay.Bratt@usdoj.gov

---

[3] At several other points during the sentencing hearing, the Court discussed the lack of controls at Himbol to prevent or provide warnings of suspicious financial transactions.  See Sentencing Transcript at 22-23, 40-42, and 45-46.

**Certificate of Service**

     I, Jay I. Bratt, certify that I served the foregoing Government's Memorandum in Opposition to Defendant's Supplement to His Motion for Release Pending Appeal by ECF on his counsel of record, AFPD Tony Axam, this 3rd day of February, 2008.

                                                        /s/
                                              Jay I. Bratt