# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 8, 2008                    Decided June 17, 2008

No. 06-3139

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED  JUN 1 7 2008

CLERK

UNITED STATES OF AMERICA,
APPELLEE

v.

DAVID H. SAFAVIAN,
APPELLANT

FILED

AUG - 7 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Consolidated with
06-3160

Appeals from the United States District Court
for the District of Columbia
(No. 05cr00370-01)

*Lawrence S. Robbins* argued the cause for appellant. With him on the briefs were *Donald J. Russell, Alice W. Yao,* and *Daniel R. Walfish.*

*Nathaniel B. Edmonds*, Trial Attorney, U.S. Department of Justice, argued the cause and filed the brief for appellee. *Peter R. Zeidenberg* and *Roy W. McLeese, III*, Assistant U.S. Attorneys, entered appearances.

2

Before: RANDOLPH and ROGERS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: A jury convicted David H. Safavian of three counts of concealing material facts and making false statements in violation of 18 U.S.C. § 1001(a)(1) and one count of obstructing justice in violation of 18 U.S.C. § 1505.[1] The prosecution arose from investigations into a golfing trip he took with lobbyist Jack Abramoff in August 2002 while Safavian was chief of staff of the General Services Administration. We reverse on all counts.

I.

The evidence, viewed most favorably to the government, showed as follows. Safavian and Abramoff met in 1994 when Safavian joined a law firm in which Abramoff was a partner. Abramoff became a mentor to Safavian there, and the two remained close friends after Safavian left the firm. They continued to play golf and racquetball together and saw each other socially for drinks and dinner. And when Safavian was looking to leave the congressman for whom he was working in 2002, Abramoff arranged for Safavian to interview at his new firm, though he did not receive an offer.

Safavian instead became the General Services Administration's (GSA) deputy chief of staff in May 2002 and was named chief of staff two months later. GSA is responsible for procurement and property management on behalf of federal agencies. Shortly after Safavian arrived at GSA, Abramoff asked him for information about two GSA-controlled properties:

---

[1] He was acquitted of a second count of obstruction.

3

the White Oak property in Silver Spring, Maryland, a 600-acre former Naval facility; and the Old Post Office in Washington, D.C.

Abramoff was interested in having a portion of the White Oak property serve as a new location for the religious school his children attended. As to the Old Post Office building, GSA was considering redeveloping it and had been asking private parties about that possibility. Abramoff thought opportunities for one of his clients might develop.[2]

Safavian and Abramoff exchanged e-mails about these properties between May and August 2002. Abramoff sent messages to both Safavian's work and home accounts, sometimes e-mailing his work account only to inform him a message was waiting on his home account. Safavian's assistance ranged from simply obtaining information that GSA had already compiled for distribution to other parties, to more involved support that Safavian could provide as a GSA insider. For example, he supplied Abramoff with internal GSA information, told Abramoff that he had "overruled" a GSA employee who had "reservations," reviewed and edited Abramoff's letters to GSA, and set up a meeting to discuss the White Oak property. Nothing ever came of any of this and both properties remained with GSA through Safavian's tenure.

_____

[2]It is unclear whether Abramoff had a client interested in this property at the time. Safavian testified that "it's my understanding [Abramoff] didn't have a client at that point, that he was gathering information in hopes of potentially getting a client in order to potentially bid." But one of Abramoff's colleagues testified that "we were trying to ensure . . . that one of our clients could be a part of the team that helped privatize [the property]," and identified that client as "The Chitimatcha tribe."

4

While these discussions were ongoing, Abramoff invited Safavian to join him on a five-day golfing trip to Scotland in August 2002, to which Abramoff later added a weekend in London. In addition to Abramoff and Safavian, the group included Abramoff's son and colleagues, a congressman and his chief of staff, and the staff director for the House Administration Committee. Abramoff arranged the schedule and accommodations and chartered a plane for the group.

On July 25, 2002, Safavian requested an ethics opinion from GSA's general counsel about whether he could accept the air transportation as a gift. His e-mail stated:

> I am in need of an ethics opinion. I (along with wto [sic] members of Congress and a few Congressional staff) have been invited by a friend and former colleague on a trip to Scotland to play golf for four days. I will be paying for all of my hotels, meals, and greens fees. The issue is airfare.

> The host of the trip is chartering a private jet to take the eight of us from BWI to Scottland [sic] and back. He is paying the cost for the aircraft regardless of whether I go or not. In fact, none of the other guest [sic] will be paying a proportional share of the aircraft costs. I need to know how to treat this activity.

> One other point of relevance: the host is a lawyer and lobbyist, but one that has no business before GSA (he does all of his work on Capitol Hill).

The GSA ethics officer responded in part:

> This is in response to your inquiry on whether you can accept a gift of free air transportation from a friend to

5

attend an [sic] golf trip.  You stated that a friend and
former colleague, Jack Abramhoff [sic], invited you,
along with several members of Congress and a few
Congressional staff, to Scotland to play golf for four
days.  You stated that you will be paying for all of your
hotel expenses, meals and greens fees.  You noted,
however, that your friend would be providing the air
transportation at no cost to you and the other guests
attending the event.  You stated that your friend, who is
a lawyer and lobbyist with Greenberg and Traurig, is
chartering a private jet to take you and the other
participants from BWI to Scotland and back.  You stated
that neither Mr. Abramhoff [sic] nor his firm does
business with or is seeking to do business with GSA.
Based upon the information you have provided, you may
accept the gift of free transportation from your friend.

The ethics opinion recited information not provided in
Safavian's e-mail request, such as Abramoff's name and firm,
so it appears that further communications must have occurred.
Notably, the response also suggests that Safavian said Abramoff
is not "seeking to do business with GSA."    At trial the
government presented no evidence that Safavian had ever told
this to an ethics officer and the district judge therefore struck the
"seeking to do business" language from the indictment.

After receiving the ethics advice, Safavian forwarded a
copy to Abramoff, indicating that he would go on the trip.
Abramoff sent Safavian an itinerary showing the travel
schedule, hotels, golfing times, a dinner and a lunch with the
notation "included in package," and several other scheduled
meals.  Safavian told Abramoff he wanted to pay for his share
of the trip.  On the evening of the departure date – August 3,
2002 – Safavian gave Abramoff a check for $3,100, the amount
Abramoff said would cover the costs.

6.

The chartered plane landed the morning of August 4th at a small airport adjacent to the St. Andrews Links Old Course, where the group's hotel also was located. Most of their five days in Scotland were spent golfing. They played at several different courses and smoked cigars and drank while playing. Some, including Safavian, played golf more than once per day at various courses. At the Old Course greens fees and caddy tips for one person totaled $400. The group also ate and had drinks together. Meals – some at the hotel, some elsewhere – ranged from $20-$100 a person, and sometimes a round of drinks reached $100. The trip also provided an opportunity for the congressman and his staff to meet with Scottish politicians; a dinner with the Conservative Party and a military parade were scheduled one evening.

The group flew from Scotland to London on Thursday the 9th, using the same chartered plane. Upon landing, they were driven to their hotel, the Mandarin Oriental. They had drinks in the hotel bar that night and some planned on having dinner and drinks together Friday night. However, they spent less time as a group in London than they did in Scotland. For instance, one participant testified that he spent Friday with friends who lived there. At least four group members departed Saturday morning, while Safavian and Abramoff remained. Abramoff had meetings scheduled in London, so Safavian had some time to himself. On Sunday, Safavian and Abramoff flew back to the United States on the chartered jet.

Both Safavian and another participant testified that they believed the trip was prepaid. Safavian also paid for some costs himself. He withdrew $500 from his bank account before leaving and $150 on the trip's second day. He tipped the caddies once for two people and bought a few rounds of drinks. Safavian also used his credit card to buy some gifts, a few meals, and some other goods.

7

In March 2003, acting on an anonymous tip, the GSA Office of Inspector General (GSA-OIG) began investigating the trip. GSA agent Gregory Rowe interviewed Safavian twice. Rowe testified that Safavian told him that he "paid for the trip," including airfare, and that Abramoff did not have any business with GSA. Safavian also provided Rowe with a copy of the $3,100 check he had given to Abramoff on the day they had left and a work attendance sheet showing that he took five days of leave. Safavian did not mention the weekend in London or Abramoff's interest in the two GSA properties. Rowe closed the investigation. Rowe did not review the ethics opinion Safavian had received about the trip.

A year later, in March 2004, the Senate Committee on Indian Affairs began investigating Abramoff. The Committee asked Safavian to produce "all records reflecting, referring, or relating to the 2002 Scotland golf trip." Safavian's letter responded in part:

> When the invitation was made, I was the chief of staff to the U.S. General Services Administration ("GSA"). Mr. Abramoff did not have any business before the agency at that time. Prior to departure, I consulted the GSA Office of General Counsel to obtain guidance on the propriety of this trip. Counsel determined that I could accept the value of the trip *gratis*; it did not meet the definition of a 'gift from a prohibited source' under the applicable regulations, nor was it considered a gift because of my official position. Nevertheless, in the exercise of discretion, I gave Mr. Abramoff a check for the value of the trip prior to departure. In addition, I took leave without pay to travel.

8

Safavian also provided, among other things, his July 25 request for the ethics opinion, the opinion, and a copy of the $3,100 check.

A grand jury indicted Safavian on October 5, 2005, on three counts of "falsify[ing], conceal[ing] and cover[ing] up by a trick, scheme, and device material facts" in violation of 18 U.S.C. § 1001(a)(1) (Counts 2, 3, and 5) and two counts of obstruction in violation of 18 U.S.C. § 1505 (Counts 1 and 4). Counts 1 and 3 were based on Safavian's interviews with GSA inspector Rowe. Count 2 was based on Safavian's request for the ethics opinion. And Counts 4 and 5 related to his letter to the Senate Committee.

The trial began May 22, 2006, and included testimony from Rowe, the ethics officer, the investigative counsel for the Committee, and one of Abramoff's colleagues who went on the Scotland trip, among others. Safavian, testifying in his defense, discussed the golf trip, his work at GSA, and his interactions with Abramoff. Safavian testified that in his view, Abramoff was "not doing business with GSA" because Abramoff "is not a contractor, he is not exchanging property or services for money, he does not have a business relationship with GSA." As to the golf trip, Safavian claimed that he thought it was a prepaid package and that he was reimbursing Abramoff fully with the $3,100 check. Cross examination covered a wide range of subjects. With respect to the trip, for instance, the prosecutor tried to show that Safavian must have known $3,100 was inadequate and that Abramoff's $3,100 estimate obviously undercut the trip's true value. In one exchange, the prosecutor asked Safavian to compare greens fees at St. Andrews to the Queens Harbor course he played in Maryland. When Safavian responded, "That's one of the top 20 golf courses in the country . . . [but] I think they could have been in the ballpark," the prosecutor continued, "So you're thinking the birthplace of golf,

9

where people fly overseas from all over the world to go golfing, is going to charge you about what they cost over in Maryland?" The prosecutor also asked, "back in 2002 . . . how much did you think a cost of an airline ticket from Baltimore to Scotland would have cost you if you had bought it yourself?" Safavian continually maintained that he never saw and thus did not know specific costs of items but that the $3,100 was reasonable for him to believe.

On June 20, the jury convicted Safavian on Counts 1, 2, 3, and 5, and acquitted him on Count 4, the count charging obstruction of the Senate Committee investigation. Count 1, obstruction of the GSA-OIG investigation, was a general verdict, based on the indictment's charges that Safavian "falsely stated . . . that [Abramoff] had no business with GSA" and "that he had paid [Abramoff] for the total cost of the trip." Count 2 was based on the exchange with the ethics officer. On a special verdict form, the jury found that Safavian "concealed his assistance to Mr. Abramoff in GSA-related activities" (Specification A) and "falsely stated to the GSA ethics officer that Mr. Abramoff did all his work on Capitol Hill" (Specification C). Count 3 was based on Safavian's statements and omissions during his interviews with GSA-OIG agent Rowe. The jury found that Safavian "concealed his assistance to Mr. Abramoff in GSA-related activities" (Specification A). Count 5 was based on Safavian's letter to the Committee. The jury found that he "falsely stated in a letter to the Committee that Mr. Abramoff did not have any business with GSA at the time Mr. Safavian was invited on the trip to Scotland" (Specification C).

Safavian moved for a judgment of acquittal on all four counts. *See United States v. Safavian*, 451 F. Supp. 2d 232, 238 (D.D.C. 2006). His motion set forth several arguments that he renews on appeal. Safavian contended that Specification A of Count 2 and Count 3 should be vacated "because he had no legal

10

duty to disclose the information concealed." *Id.* at 240. He argued that all the § 1001(a)(1) convictions should be vacated because there was insufficient evidence that his statements were not true as he meant them (i.e., that they were literally true). *Id.* at 242. Also regarding § 1001(a)(1) he claimed that there was insufficient evidence for the jury to determine that he had the requisite specific intent to commit the false statement offenses. *Id.* at 244. As to the obstruction conviction, Safavian argued that his statements were fundamentally ambiguous. *Id.* at 248. The district judge rejected all these arguments, as well as a number of others not raised on appeal.

The court sentenced Safavian to concurrent terms of 18 months imprisonment on each count, followed by two years of supervised release. He was released on bond pending appeal pursuant to 18 U.S.C. § 3143(b).

## II.

We will begin with Safavian's convictions on Counts 2 and 3. Each of these counts, and Count 5, charged violations of 18 U.S.C. § 1001(a)(1): a person "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States," commits an offense if he "knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact." *Id.*[3]  On Count 2,

---

[3]Section 1001(a) in its entirety provides:
Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully –
(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
(2) makes any materially false, fictitious, or fraudulent

11

which dealt with Safavian's request for a GSA ethics opinion, the jury found that he violated § 1001(a)(1) when he "concealed his assistance to [Abramoff] in official GSA-related activities."[4] On Count 3, which dealt with the GSA Inspector General's investigation, the jury found that Safavian violated § 1001(a)(1) when he "concealed his assistance to [Abramoff] in official GSA-related activities," the same concealment allegation contained in Count 2.

Safavian raises several serious objections to his convictions on the concealment charges, though we only reach the question whether he had a duty to disclose his assistance. As to Count 2, he points out that officers and employees of the executive, judicial, and legislative branches regularly seek advice from their respective ethics committees. They are encouraged to do so. The value of the advice they receive depends upon the accuracy and fullness of the information they

---

statement or representation; or

(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

[4]The jury also found, under what the parties term specification C of Count 2, that Safavian violated § 1001(a)(1) when he "falsely stated" that Abramoff "did all his work on Capitol Hill."

12

provide. At GSA, as elsewhere in the federal government, the officer or employee making the inquiry may or may not follow the advice of the ethics committee. That he did not follow that advice does not in itself constitute an ethical transgression. The prosecutors in this case are mistaken when they write that the GSA "ethics opinion . . . permitted [Safavian] to engage in behavior that would be prohibited if he had disclosed all relevant information." Gov't Br. 28–29. The ethics opinion did no such thing. It was not up to the GSA ethics officers to permit or forbid; their function was to offer advice. It is not apparent how this voluntary system, replicated throughout the government, imposes a duty on those seeking ethical advice to disclose – in the government's words – "all relevant information" upon pain of prosecution for violating § 1001(a)(1).[5] As Safavian argues and as the government agrees, there must be a legal duty to disclose in order for there to be a concealment offense in violation of § 1001(a)(1),[6] yet the government failed to identify a legal disclosure duty except by reference to vague standards of conduct for government employees.

---

[5]Disclosing all relevant circumstances merely offers the employee protection from disciplinary action: "Disciplinary action for violating this part or any supplemental agency regulations will not be taken against an employee who has engaged in conduct in good faith reliance upon the advice of an agency ethics official, provided that the employee, in seeking such advice, has made full disclosure of all relevant circumstances." 5 C.F.R. § 2635.107(b).

[6]See, e.g., United States v. Blackley, 167 F.3d 543, 550 (D.C. Cir. 1999); United States v. Calhoon, 97 F.3d 518, 526 (11th Cir. 1996); United States v. Irwin, 654 F.2d 671, 679 (10th Cir. 1981).

13

These standards are formulated as fourteen "general principles" that executive branch "employees shall apply . . . in determining whether their conduct is proper." 5 C.F.R. § 2635.101(b). They range from exceedingly vague – "Employees shall put forth honest effort in the performance of their duties," § 2635.101(b)(5) – to somewhat more descriptive – "Employees shall not use public office for private gain." § 2635.101(b)(7). Only one has anything to do with disclosure. *See* § 2635.101(b)(11) ("Employees shall disclose waste, fraud, abuse, and corruption to appropriate authorities."). These strictures are of no more help to the government's argument than the regulation on seeking ethics advice. Their relationship to Safavian's duty under § 1001(a)(1) is tenuous at best. If an employee violates a standard of conduct, he may be subject to disciplinary action. § 2635.106(a). We cannot see how this translates into criminal liability under 18 U.S.C. § 1001(a)(1) whenever someone seeking ethical advice or being interviewed by a GSA investigator omits "relevant information."

Concealment cases in this circuit and others have found a duty to disclose material facts on the basis of specific requirements for disclosure of specific information. *See, e.g., United States v. Moore*, 446 F.3d 671, 678 (7th Cir. 2006); *United States v. Kanchanalak*, 192 F.3d 1037, 1046 (D.C. Cir. 1999); *Blackley*, 167 F.3d at 550 (D.C. Cir. 1999); *United States v. Dale*, 140 F.3d 1054, 1056 (D.C. Cir. 1998); *Calhoon*, 97 F.3d at 526. There is good reason for demanding such specificity: to comply with Fifth Amendment due process, the defendant must have "fair notice . . . of what conduct is forbidden. . . . [T]his 'fair warning' requirement prohibits application of a criminal statute to a defendant unless it was reasonably clear at the time of the alleged action that defendants' actions were criminal." *Kanchanalak*, 192 F.3d at 1046 (citing *United States v. Lanier*, 520 U.S. 259, 266 (1997)). The ethical principles give no indication of the particular facts

14

or information an executive employee must disclose. Nor do they suggest that they have any bearing on conduct during a GSA investigation or a request for an ethics opinion.

The government also invoked, in support of the verdict on the concealment charges in Count 2 and Count 3, "the principle that once one begins speaking when seeking government action or in response to questioning, one must disclose all relevant facts." Gov't Br. 23. The government cites no regulation or form or statute to this effect and the defense maintains that no such general principle exists. Attorneys commonly advise their clients to answer questions truthfully but not to volunteer information. Are we to suppose that once the client starts answering a government agent's questions, in a deposition or during an investigation, the client must disregard his attorney's advice or risk prosecution under § 1001(a)(1)? The government essentially asks us to hold that once an individual starts talking, he cannot stop. We do not think § 1001 demands that individuals choose between saying everything and saying nothing. No case stands for that proposition.[7]  We

---

[7]The government cites *United States v. Moore*, 446 F.3d 671 (7th Cir. 2006), and *United States v. Cisneros*, 26 F. Supp. 2d 25 (D.D.C. 1998), as supporting its position. Gov't Br. 24. However, the jury instructions in *Moore* stated, "The duty to disclose a particular fact to the executive branch of the federal government or its agent arises from requirements in federal statutes, regulations, or government forms." 446 F.3d at 680; *see also id.* at 678. In *Cisneros*, the questions posed to the defendant by the FBI agent were rooted in a government form that the defendant had filled out. *See* 26 F. Supp. 2d at 32.

15

therefore conclude that Safavian had no legal duty to disclose and that his concealment convictions cannot stand.[8]

### III.

The remaining charges are the alleged false statements Safavian made, as specified in Count 1 (obstruction of justice, 18 U.S.C. § 1505) and Counts 2 and 5 (§ 1001(a)(1)).[9] Each of

---

[8]The district court's instructions permitted the jury to find Safavian guilty of violating § 1001(a)(1) if he committed "any knowing omission designed to deceive others by preventing or delaying the discovery of information." As a result, Safavian's concealment convictions on Counts 2 and 3 could have rested simply on his nondisclosure of material facts. Yet concealment must be accomplished in a particular way: by a "trick, scheme, or device." *United States v. Woodward*, 469 U.S. 105, 108 (1985) (per curiam), so holds, as does *United States v. London*, 550 F.2d 206, 213 (5th Cir. 1977), which the Supreme Court cited with approval. 469 U.S. at 108 n.5. Because Safavian's concealment convictions must be reversed for lack of a duty to disclose, we place our decision on that ground and do not address whether, as the government argues, the erroneous jury instruction was harmless.

[9]Safavian argues that his statements should not have been submitted to the jury because they were fundamentally ambiguous and thus the jurors "could only guess what he may have meant." Safavian Br. 33. Assuming *arguendo* that the doctrine of fundamental ambiguity applies to false statements such as these, it was well within the province of the jury to determine what Safavian meant. Likewise, we reject Safavian's argument that there was insufficient evidence for the jury to conclude that the statements were false as Safavian intended them. *See, e.g., United States v. Milton*, 8 F.3d 39, 45–46 (D.C.

16

the statements was to the effect that Abramoff had no business
with GSA at the time of the golf trip.[10]  In defense of these
charges, Safavian maintained that when he made the statements
he intended the meaning common to government contracts
professionals – that is, someone who does not have a contract
with GSA is not doing business or working with GSA.  Safavian
contended that his statements were truthful because Abramoff
never secured any GSA contract.  With respect to the White Oak
property, the headmaster of the school never requested a lease
and GSA never transferred the property to the school.  As to the
Old Post Office, GSA issued no proposal during the tenure of
the GSA Administrator for whom Safavian worked.

---

Cir. 1993).

[10]The false statement charge in Count 2 was worded a bit
differently than the charge in Counts 1 and 5: it alleged that
Safavian falsely told the GSA ethics official that Abramoff "did
all his work on Capitol Hill."  Safavian's written request for an
ethics opinion did state that the "host" of the golfing trip to
Scotland, "a friend and former colleague," "is a lawyer and
lobbyist, but one that has no business before GSA (he does all
of his work on Capitol Hill)."  The GSA ethics officer, in
rendering the opinion, took this as meaning that "neither Mr.
Abramoff nor his firm does business" with GSA.  That of course
was the material question.  If, for instance, it turned out that
Abramoff transacted business with other parts of the Executive
Branch and not just on Capitol Hill, Safavian's parenthetical
statement would have been inaccurate, but we cannot see how
the inaccuracy would have been material.  Safavian maintained
that he meant the same thing when he wrote to the ethics officer
that Abramoff had no business before GSA and when he implied
that Abramoff did no work with or at GSA.

17

We agree with Safavian that the district court abused its discretion in excluding favorable expert testimony on how government contracting professionals view having business or working with GSA. *See United States v. Washington*, 106 F.3d 983, 1009 (D.C. Cir. 1997). Federal Rule of Evidence 702 permits an expert to "assist the trier of fact to understand the evidence or to determine a fact in issue." The court may refuse to admit testimony whose "probative value is substantially outweighed by the danger of . . . confusion of the issues[] or misleading the jury." FED. R. EVID. 403. Safavian's expert would have testified that an individual is not doing business with GSA until a contract is awarded and that getting information from GSA is simply that, getting information. Defense counsel offered this testimony to show that Safavian's definition "isn't made up out of whole cloth." The testimony would have bolstered Safavian's contention that, as a government contracts professional himself, he had this meaning in mind when he communicated with the GSA ethics official, Rowe, and with the Senate Committee.

In excluding this testimony, the district court reasoned that it would not help the jury and would be confusing. The court asserted that the meaning of "business" "is within the common parlance of the jury," and thus "the layman's definition of these terms are the best guide for the jury. There's no need for expert testimony." This ruling usurped the jury's role by deciding that the lay meaning of "business" is what Safavian meant to convey. The court at one point recognized that "[w]hat was in the defendant's mind is at issue in this case." But excluding the expert testimony effectively preempted the jury's conclusion on this issue.

In support of the district court's ruling the government takes inconsistent positions. On the one hand, it tells us that "the meaning of 'business' and 'work' were properly left for the

18

jury's determination in assessing Safavian's criminal intent."
Gov't Br. 41. If the meanings of these terms were appropriate
"for the jury's determination" – as we believe they were – then
they are not legal terms to be defined by the court. Yet the
government also claims that the district court's exclusion of the
expert testimony was proper because the expert would have
opined on the meaning of specific legal terms.[11]  Gov't Br.
47–48. The phrases "does business" and "seeks to do business"
do appear in the regulations regarding gifts from prohibited
sources. *See* 5 C.F.R. § 2635.203. But whether Abramoff was
or was not a prohibited source misses the point. The question
for the jury was what Safavian meant when he communicated
with government officials.  The expert would not have
expounded on how § 2635.203 operates or should operate, but
rather on the common usage of the terms in the government
contracts industry.

We do not find the exclusion of the expert's testimony
harmless.  With respect to Counts 2 and 5, which charged
violations of § 1001(a)(1), literal truth would have been a
complete defense. *See Milton v. United States*, 8 F.3d 39, 45
(D.C. Cir. 1993).[12]  If Safavian intended having business or

---

[11]It is unclear from the transcript whether the district
court also relied on this ground. The court cited and discussed
cases precluding experts from "offering an impermissible legal
conclusion" but later stated that here "we have the converse or
the inverse of that situation" because business and work "are not
defined terms."

[12]Not until his reply brief did Safavian argue that under
§ 1001(a)(1) a false statement alone cannot constitute a "trick,
scheme, or device." While he is doubtless correct on the law,
*see Woodward*, 469 U.S. at 108 n.4 (1985); *United States v. St.
Michael's Credit Union*, 880 F.2d 579, 589-90 (1st Cir. 1989);

19

working with GSA to have the meaning used by government contract professionals, then he did not knowingly and willfully make a false statement to the GSA ethics officer (Count 2) or the Senate Committee (Count 5). *See, e.g., United States v. Gahagan*, 881 F.2d 1380, 1384 (6th Cir. 1989); *United States v. Anderson*, 579 F.2d 455, 460 (8th Cir. 1978). The jury's duty was to decide which meaning Safavian intended – the contracting meaning or the "lay" meaning – "by considering the term in context, taking into account the setting in which it appeared and the purpose for which it was used." *Milton*, 8 F.3d at 45. Evidence showed that Safavian had substantial experience in the field of government contracts. The expert's testimony would have supplied crucial context and support for Safavian's proposed meaning. This testimony would have been especially important in light of the fact that two government witnesses, though not appearing as experts, testified regarding their own interpretations of the phrase "doing business." Excluding the expert's testimony thus was not harmless.

Count 1, the obstruction of justice charge, presents a closer question. The jury rendered a general verdict of guilty on

---

*London*, 550 F.2d at 212; *United States v. Diogo*, 320 F.2d 898, 902 (2d Cir. 1963), his argument comes too late and was apparently not made in his motion for judgment of acquittal. *See, e.g., Students Against Genocide v. Dep't of State*, 257 F.3d 828, 835 (D.C. Cir. 2001); *Bd. of Regents of the Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.C. Cir. 1996). (Safavian was not charged with violating § 1001(a)(2), the subsection proscribing the making of "any materially false, fictitious, or fraudulent statement or representation" within the jurisdiction of the three branches of government. Nor was he charged with violating § 1001(a)(3), under which it is a criminal offense to make or use "any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry.")

20

that count. The indictment charged that Safavian obstructed GSA's investigation in two ways: by "falsely stat[ing] in substance and in part that [Abramoff] had no business with GSA" and by stating "in substance that he had paid [Abramoff] for the total cost of the trip . . . ." The excluded testimony related to only one of these allegations, but reversal is still required unless the court's ruling constituted harmless error. *See Griffin v. United States*, 502 U.S. 46, 59 (1991); *Yates v. United States*, 354 U.S. 298 (1957). One is guilty of obstruction if he "corruptly . . . influences, obstructs, or impedes or endeavors to influence, obstruct, or impede" an investigation. 18 U.S.C. § 1505. Section 1515 defines "corruptly" as "acting with an improper purpose . . . including making a false or misleading statement, or withholding, [or] concealing" information. Even a literally true statement may be misleading and so, unlike § 1001(a)(1), literal truth may not be a complete defense to obstruction. *See United States v. Browning*, 630 F.2d 694, 699 (10th Cir. 1980). Even so, if Safavian's expert witness had convinced the jury of the truth of his statements, this would have gone at least part of the way to convincing the jury that he had not obstructed justice. We therefore believe that excluding the expert's testimony had "a substantial and injurious effect or influence in determining the jury's verdict" on Count 1, particularly since the audience for his statement about Abramoff's lack of "business" at GSA was a GSA official presumably versed in the technical meaning of the term. *Kotteakos v. United States*, 328 U.S. 750, 776 (1946).[13]

---

[13]The government, in arguing generally that exclusion of the expert's testimony was harmless because the jury learned of Safavian's "understanding of the terms 'business' and 'work'," does not direct its contentions specifically to Count 1. Gov't Br. 50.

21

IV.

Safavian claims that there was insufficient evidence to support the jury's verdict on Count 1's alternative allegation that he obstructed justice by telling GSA investigator Rowe "in substance" that he paid for the full cost of the trip including airfare.[14] Safavian's argument is that the evidence shows only that he said he paid the amount Abramoff specified, not that he paid the total cost of the trip. At trial, however, Safavian equated the two, admitting that he "said that [his] $3,100 covered [his] full share." Safavian also conceded that he "told Special Agent Rowe that [he] paid for all the costs associated with the trip." There was more than enough evidence that Safavian caused Rowe to believe that he had paid for all his costs.

There was also sufficient evidence for the jury to conclude that Safavian knew the true cost of his share was greater than $3,100. For instance, another trip participant testified at length about the group's activities. He stated that the total cost for a round of golf on the St. Andrews Old Course was $400 per person and that Safavian played golf at least six times (though did not specify on which of the courses). He also discussed the expensive meals and drinks the group had. There was additional evidence of specific costs for certain members of the group: testimony indicated that the two nights in the London Mandarin Oriental hotel cost $1,000 and that the commercial value of a return flight was $850 or $900. The government also introduced invoices showing costs of the hotel in Scotland. All

---

[14]Though we have already ordered a new trial on Count 1, we address this issue to determine whether the government may include this charge if it chooses to retry Safavian for obstruction.

22

of this provides circumstantial evidence of Safavian's knowledge.

Safavian responds that there was no evidence that his costs were comparable to the other travelers or that he ever saw the invoices or knew what the costs were. But that only shows that he did not know the precise cost of his share. There was sufficient evidence for the jury to conclude that Safavian knew $3,100 was too low but that he told Rowe $3,100 was enough. The jury did not need to address Safavian's knowledge of exactly *how* low $3,100 was. Moreover, the jury could have credited Rowe's testimony that Safavian said he paid for his share of the cost of the flight, which is conceded to be false.[15]

\* \* \*

For the foregoing reasons, we reverse Safavian's convictions on Counts 2A and 3, and vacate his convictions on Counts 1, 2C, and 5 and remand for a new trial.

*So ordered.*

_____

[15]Safavian told the Senate Committee that he did not pay for the flight, and the jury acquitted him of obstructing that investigation.